The **UTILITY REFORM NETWORK, a California non-profit corporation,** Plaintiff,

v.

**CALIFORNIA PUBLIC UTILITIES COMMISSION; P. Gregory Conlon; Henry M. Duque; Jessie J. Knight, Jr.; Josiah L. Neeper; Richard A. Bilas; Wesley M. Franklin, Defendants.**

No. C 97–00232 CW.

United States District Court,
N.D. California.

July 1, 1997.

Ellis Ross Anderson, Anderson Donovan & Poole, San Francisco, CA, Thomas J. Long, Utility Reform Network, San Francisco, CA, for Plaintiff.

Alberto Guerrero, PUC of State of California, San Francisco, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

WILKEN, District Judge.

Defendants California Public Utilities Commission ("CPUC"), the Commissioners of the CPUC, and the Executive Director of the CPUC move to dismiss Plaintiff The Utility Reform Network's ("TURN") complaint for lack of subject matter jurisdiction and for failure to state a claim. Plaintiff opposes the motion. The matter was heard on June 20, 1997. Having considered all of the papers filed by the parties and oral argument on the motion, the Court GRANTS the motion.

## BACKGROUND

On February 8, 1996, the Telecommunications Act of 1996, Pub.L. 104–104, 110 Stat. 56, 47 U.S.C. § 251 *et seq.*, was enacted. The Act, among other things, provided for the introduction of competition into local telephone service. *See* 47 U.S.C. § 252. Congress was concerned, however, that the introduction of local competition might have the effect of rendering basic telecommunications services too expensive in rural and high cost areas. The Act therefore required the Federal Communications Commission ("FCC" or "Commission") to establish mechanisms by which telecommunications carriers that provide interstate telecommunications services would "contribute" to the preservation and advancement of universal service. 47 U.S.C. § 254(d).[1] The Act also provides that telecommunications carriers "that pro-

---

1. Section 254(d) reads in its entirety,

    Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

vide intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State." 47 U.S.C. § 254(f).[2]

On October 25, 1996, the CPUC adopted two end-user surcharges to finance two new intrastate universal telephone service programs. Guerrero Decl., Ex. A, CPUC Decision 96–10–066. Each surcharge is listed as a separate item on customers' telephone bills and is collected by customers' telephone service providers. Prior to the CPUC's decision, Plaintiff TURN, an organization representing residential and small business utility customers, had urged the CPUC to require telephone service providers to fund the universal service programs. Although TURN acknowledges that customers would pay for at least part of the universal service programs regardless of the specific funding mechanism chosen, it urged that telephone service providers be required to pay for the programs in the first instance because it believes that market forces may operate to prevent telephone companies from passing the entire cost of these programs onto customers.

The CPUC denied Plaintiff's request for a stay on implementation of the decision.

On January 21, 1997, Plaintiff filed this lawsuit in United States District Court, alleging that the CPUC's decision to impose end-user surcharges violated the Telecommunications Act of 1996 and the Commerce Clause. Defendants moved to dismiss Plaintiff's complaint for lack of subject matter jurisdiction and for failure to state a claim. Hearing on Defendants' motion was rescheduled to enable the parties to submit briefing on FCC Order 97–157 ("Order"), which imposed fees on interstate telecommunications carriers, rather than on end users, to finance universal service programs.

2. Section 254(f) provides in its entirety,
   A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in

## DISCUSSION

### I. Legal Standard for Motion to Dismiss

■■■ A motion to dismiss for failure to state a claim will be denied unless it appears that the plaintiff can prove no set of facts which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Fidelity Fin. Corp. v. Federal Home Loan Bank of San Francisco*, 792 F.2d 1432, 1435 (9th Cir.1986), *cert. denied*, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987). All material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986).

### II. Telecommunications Act of 1996

#### A. Enforceability

As an initial matter, Defendants contend that Plaintiff does not have a cause of action even if the CPUC's decision violates the Telecommunications Act because the Act does not provide Plaintiff a cause of action. Plaintiff responds that it may enforce section 254(f) of the Telecommunications Act through either of two mechanisms: section 1983 or declaratory and injunctive relief based on federal preemption.

#### 1. Section 1983

■■ Section 1983 imposes liability on anyone who, under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In order to obtain redress through section 1983, "a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.*" *Blessing v. Freestone,* 520 U.S. 329, ——, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997) (emphasis in the original). The Supreme Court has articulated a three-factor test for determining

that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

whether a particular statutory provision gives rise to a federal right:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States.

*Id.* (citing *Wright v. Roanoke Redevelopment and Housing Auth.,* 479 U.S. 418, 430–32, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)).

Plaintiff argues that the Telecommunications Act conferred upon telecommunications consumers the right "to be free from the imposition of ratepayer-funded contributions to finance new universal support mechanisms that may be adopted by both state and federal regulations." Complaint ¶ 38.

Neither statutory language nor legislative history supports Plaintiff's interpretation. Section 254(f) provides that "Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State." The provision pertaining to funding for universal service for interstate telecommunications also provides that "Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the ... mechanisms established by the Commission to preserve and advance universal service." 47 U.S.C. § 254(d). Plaintiff argues that Congress deliberately chose to use the word "contribute" in these provisions and that by "contribute" Congress meant "contribute money." To support this interpretation it quotes a Senate committee report on an early version of the bill that became the Telecommunications Act of 1996: "Competitors to the telephone companies must *pay their share* to support the costs of providing telephone service in rural and high-cost areas." S.Rep. No. 103–367, at 4 (emphasis added).

Even assuming that Plaintiff's reading of the statute to require that telecommunications carriers contribute financially to the provision of universal services is correct, it

has failed to establish that section 254(f) also confers a substantive right on telecommunications consumers "to be free from the imposition of ratepayer-funded contributions" to universal support mechanisms. Although section 254(f) may require carriers to contribute financially, it is silent about whether States may also impose end-user fees to subsidize universal service programs.

The legislative history also indicates that Congress was focused on requiring that all telecommunications carriers be treated alike rather than on specifying the means by which universal access services should be financed. Although Plaintiff cites the Senate report for the proposition that all carriers should pay, the report is more concerned with ensuring that telecommunications carriers be treated alike. The report described the bill as requiring *"all* telecommunications carriers to contribute to a universal service fund." S. Rep. 103–367, at 4. It elaborated that "Competitors to the telephone companies must pay their share to support the costs of providing telephone service in rural and high-cost areas." *Id.* The committee report does not state that telecommunications carriers must bear all the costs of providing universal services and does not discuss whether States may fund universal service programs through end-user fees.

Thus, even if Congress intended to require telecommunications carriers to contribute financially, Plaintiff has not established that Congress intended to protect consumers from being required to contribute directly to the provision of universal services. Plaintiff has therefore failed to establish that Congress intended to confer a benefit on telecommunications consumers "to be free from the imposition of rate-payer funded contributions to finance new universal support mechanisms."

Even if section 254(f) did confer a federal right upon consumers, Plaintiff has not established that the statute "unambiguously impose[s] a binding obligation on the States." *See Blessing,* 520 U.S. at ——, 117 S.Ct. at 1359. As explained above, the term "contribute" is not unambiguous. In addition, the phrase "in a manner determined by the State" indicates that Congress did not intend

to limit the manner in which States meet the requirements of the statute.

Because section 254(f) does not confer the right asserted by Plaintiff and because it does not unambiguously impose on the States the binding obligation asserted by Plaintiff, section 1983 does not provide Plaintiff a remedy for the CPUC's allegedly unlawful decision to fund universal service programs with end-user fees rather than with financial contributions from telecommunications carriers.

2. Preemption Cause of Action

Plaintiff argues that even if section 1983 does not provide a remedy, injunctive and declaratory relief are nonetheless available because the CPUC regulations are preempted by federal law.[3] As a general rule, private parties may seek injunctive and declaratory relief against enforcement of State regulations when the State regulations are preempted by federal statute, even when the federal statute itself does not create a private right of action. *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir.1994), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2610, 132 L.Ed.2d 854 (1995). *See also Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107–08, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); *id.* at 119, 110 S.Ct. 444 (Kennedy, J. dissenting) (declaratory relief is available even when the preemptive federal statute creates no enforceable statutory rights).

Plaintiff concludes from this general rule that it may seek equitable relief because the CPUC decision allegedly conflicts with, and is therefore preempted by, federal law. The cases on which Plaintiff relies for this proposition, however, all involve instances in which a federal statute had "occupied the field," thereby preventing any state regulation of matters falling within the scope of the federal statute. *See Livadas v. Bradshaw*, 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (National Labor Relations Act ("NLRA")); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (Airline Deregulation Act ("ADA")); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (NLRA); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983) (Employee Retirement Income Security Act ("ERISA")); *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261 (9th Cir. 1994) (NLRA); *Federal Express Corp. v. California Pub. Util. Comm'n*, 936 F.2d 1075 (9th Cir.1991) (ADA).

These cases establish that individuals may challenge State regulations despite the lack of a statutory cause of action when a federal statute forbids State regulation of the area that the State is purporting to regulate. The Court is not aware of any authority holding that a preemption cause of action may serve as a vehicle to challenge an otherwise permissible State regulation simply because it allegedly violates a substantive provision of a federal statute. The Second Circuit has explained that, in the absence of a federal statutory cause of action, declaratory relief is available only when a federal statute precludes State regulation of the matter being litigated. *Western Air Lines, Inc. v. Port Auth. of New York and New Jersey*, 817 F.2d 222, 225–26 (2d Cir. 1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1467, 99 L.Ed.2d 697 (1988); *see also Burgio and Campofelice, Inc. v. NYS Dep't of Labor*, 107 F.3d 1000, 1007 (2d Cir.1997). A preemption cause of action for declaratory relief is not an alternate means for enforcing the substantive provisions of the federal statute. *Western Air Lines*, 817 F.2d at 225–26.

Here, California clearly has the authority to adopt regulations concerning the manner in which telecommunications carriers should contribute to the provision of universal services. Section 254(f) explicitly authorizes States to determine the manner in which carriers should contribute to the provision of universal services. Because federal

---

**3.** Plaintiff describes its preemption cause of action as being brought under the *Ex parte Young* doctrine. *See Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Ex parte Young* stands for the proposition that federal courts may enjoin State officers from violating federal law.

At issue here is not the authority of this Court to enjoin members of the CPUC, but rather whether Plaintiff's preemption cause of action is an appropriate vehicle for challenging the CPUC's decision.

law explicitly authorizes California to regulate the manner in which carriers contribute to the provision of universal services, Plaintiff may not challenge the CPUC's compliance with the substantive provisions of the Telecommunications Act by means of a preemption cause of action.

### B. Legality of End–User Surcharge

Even if Plaintiff could challenge the CPUC's end-user surcharge by means of a section 1983 or a preemption cause of action, its challenge would fail on the merits. Plaintiff contends that Defendants violated section 254(f) by declining to require telecommunications carriers to contribute financially to the provision of universal services. Plaintiff bases its argument that section 254(f) requires carriers to contribute financially on three grounds: the plain meaning of the word "contribute," the FCC's decision not to impose end-user surcharges on interstate telecommunications, and legislative history indicating that Congress intended telecommunications carriers to "pay," not simply "participate."

Citing dictionary definitions of the word "contribute," Plaintiff argues that the statute clearly requires carriers to pay money from their own earnings to support universal service. Defendants counter that the CPUC's decision does require carriers to "contribute" because carriers must bear the administrative expenses of collecting the end-user fees from customers. They also argue that section 254(f) explicitly confers discretion on State governments to determine the manner in which carriers shall contribute to universal services. Plaintiff concedes that Defendants enjoy some discretion but maintains that Defendants' interpretation of section 254(f) reads the word "contribute" out of the statute.

The word "contribute," by itself, is insufficient to establish that fees to support universal service must be assessed against carriers rather than end users. In addition, the requirement that carriers contribute on an equitable and nondiscriminatory basis is followed immediately by the phrase "in a manner determined by the State." This phrase suggests that States have discretion to determine the manner in which carriers should contribute. Subsection 254(f) does

impose two limitations State discretion: a State's regulations may not be "inconsistent with the Commission's rules to preserve and advance universal service" and its regulations may provide additional standards "only to the extent that such regulations adopt . . . mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms." Plaintiff does not argue that end-user surcharges rely on or burden Federal support mechanisms. Plaintiff argues instead that end-user surcharges are inconsistent with the FCC's rules.

Plaintiff stresses that the "Recommended Decision" of the Federal–State Joint Board concerning the provision of universal telecommunications services found that the Telecommunications Act required carriers to contribute financially to the provision of universal interstate services. Plaintiff's Request for Judicial Notice, Ex. E. The Joint Board did find that recommendations to fund universal services with end-user surcharges "would violate the statutory requirement that carriers, not consumers, finance support mechanisms." *Id.* ¶ 812, at 411. It did not explain why it believed that the statute required "carriers, not consumers," to finance universal services. In any event, the recommended decision is not itself a final decision by the FCC concerning the proper interpretation of the Telecommunications Act.

The FCC's Order does not explicitly state that the Telecommunications Act forbids the imposition of end-user surcharges. The Order states that the FCC

> agree[s] with the Joint Board and reject[s] commenters' suggestions that the Commission mandate that carriers recover contributions through an end-user surcharge. The state Joint Board members also assert that state commissions "should have the discretion to determine if the imposition of an end-user surcharge would render local rates unaffordable." A federally prescribed end-user surcharge would dictate how carriers recover their contribution obligations and would violate Congress's mandate and the wish of the state members of the Joint Board.

Guerrero Decl., Ex. A, ¶ 853. Although the Order does observe that a federally prescribed end-user surcharge would violate a congressional mandate, it does not specify which mandate a federally prescribed end-user surcharge would violate. Plaintiff juxtaposes the FCC's reference to a congressional mandate with the Joint Board's observation that the Telecommunications Act requires carriers, not consumers, to finance universal access services. The FCC Order itself, however, does not explicitly state that the Commission agrees with the Joint Board's interpretation of the statute as prohibiting the imposition of end-user surcharges.

The Court concludes that the FCC did not interpret the Telecommunications Act as prohibiting the imposition of end-user surcharges to support universal access services. The ambiguous reference to a congressional mandate is insufficient to establish that the FCC interpreted the Telecommunications Act to foreclose the adoption of end-user surcharges by either the federal government or the States to finance universal access services. If the FCC interpreted the statute to bar the imposition of end-user surcharges, it would have been unnecessary for the Commission to explain why, as a policy matter, it preferred giving discretion to carriers and the States to determine how interstate carriers should recover their contributions to universal access services. *See, e.g.,* Guerrero Decl., Ex. A., ¶¶ 826, 829, 834, and 853. The FCC's attentiveness to State discretion belies Plaintiff's contention that the Telecommunications Act limited the ability of States to impose end-user surcharges.

If, in fact, the FCC believed that the Telecommunications Act foreclosed the option of imposing end-user surcharges, its extensive discussion of economic policy and State discretion in regulating rates would be superfluous, if not irrelevant. *See id.* at ¶¶ 14, 16, 809, 823, 826, 827, 834, and 853.

Moreover, the FCC quoted a Senate report on an earlier version of the Telecommunications Act, which explained that "the bill does not presume that any particular existing mechanism for universal service must be maintained or discontinued." *Id.* at ¶ 823 (quoting S.Rep. No. 104–23, at 57 (1995)). The bill which the report accompanied contained the directive that carriers "shall contribute on an equitable and nondiscriminatory basis." S. 652, 104th Cong. § 253(c) (1995). The legislative history, as quoted by the FCC, therefore refutes Plaintiff's assertion that Congress intended to foreclose use of end-user surcharges, a mechanism which California was using to subsidize telephone service for low-income households prior to passage of the Telecommunications Act.

Plaintiff has therefore failed to establish either that the CPUC's regulations are inconsistent with FCC regulations or that the FCC interprets the Telecommunications Act to foreclose entirely the use of end-user surcharges to finance universal access services.[4]

Finally, Plaintiff contends that the legislative history supports their interpretation of section 254(f). As discussed above, an early committee report on the Telecommunications Act indicated that all carriers would be required to "pay their share" of the costs of providing universal services. S. Rep. 103–367, at 4. The emphasis of the Committee's discussion of carriers' obligation to contribute to universal services, however, was not on the particular manner in which universal services would be funded but rather on ensuring that all carriers would contribute and that all would be treated alike.

Plaintiff also points out that the version of the Telecommunications Act that was originally passed by the Senate used the word "participate," not "contribute." *See* 141 Cong. Rec. S8575 (daily ed. June 16, 1995). It argues that Congress' decision to change the word "participate" to the word "contribute" indicates that Congress intended to foreclose the CPUC's decision not to require financial contributions from carriers. Although the word "contribute" does have stronger financial connotations than the word "participate," this change, by itself, is insufficient to clarify Congress' intent when it chose the word "contribute."

---

**4.** As Plaintiff acknowledged at oral argument on this motion, the FCC's interpretation of the Telecommunications Act does not bind this Court.

In addition, as noted above, a Senate committee report, when explaining the purpose of establishing the joint federal-state board to advise the FCC, noted that the legislation did not "presume that any particular existing mechanism for universal service support must be maintained or discontinued." S.Rep. No. 104–23, at 57. At the time of the committee report, California imposed end-user surcharges on telephone service to subsidize service for low-income households. The legislative history, therefore, rebuts Plaintiff's contention that Congress intended to require telecommunications carriers, not end users, to fund universal access services.

■ The Court therefore concludes that section 254(f) does not preclude the CPUC from financing universal access services by means of end-user surcharges.

III. Commerce Clause

■ Plaintiff also alleges that the CPUC's decision to impose end-user surcharges to fund universal service programs violates the Commerce Clause. U.S. Const. art. 1, § 8, cl. 3. Although the Commerce Clause is framed as a grant of power to Congress to regulate interstate commerce, it also limits the authority of States to enforce regulations that substantially burden interstate commerce. *South–Central Timber Development, Inc. v. Wunnicke,* 467 U.S. 82, 87, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). This implicit limitation on State authority is commonly referred to as the dormant Commerce Clause.

Here, Plaintiff contends that the CPUC's decision to impose end-user surcharges interferes with the right of Californians to engage in interstate commerce free from restrictive state regulation. Defendants now move to dismiss Plaintiff's Commerce Clause cause of action for failure to state a claim.

■ The first step in a dormant Commerce Clause analysis is to determine whether the state regulation " 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.' " *Oregon Waste Systems, Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 114 S.Ct. 1345, 1350, 128 L.Ed.2d 13 (1994) (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727,

60 L.Ed.2d 250 (1979)). By "discrimination" the Supreme Court meant "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* If a restriction discriminates against out-of-state economic interests, courts must apply strict scrutiny. Nondiscriminatory regulations that have only incidental effects on interstate commerce are valid "unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *Id.* (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

■ Plaintiff argues that end-user fees burden interstate commerce in that they impose a cost on California businesses that is not borne by out-of-state businesses. Because end-user fees do not burden out-of-state interests, the CPUC's regulations do not violate the dormant Commerce Clause unless they impose a burden on interstate commerce that is clearly excessive in relation to local benefits. As a matter of law, the end-user fees do not impose clearly excessive burdens on interstate commerce. Plaintiff does not contend that access to telecommunications is not a significant local benefit. Congress itself, by enacting the Telecommunications Act, declared that provision of universal access to telecommunications is in the national interest. The burden imposed on interstate commerce by the end-user fees is no different from those imposed by other fees and taxes which are used to support local benefits.

Because the end-user surcharge does not impose a burden on interstate commerce that is clearly excessive in relation to local benefits, it does not violate the Commerce Clause.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.