**MCI TELECOMMUNICATIONS CORPORATION, et al., Plaintiffs,**

v.

**THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY, et al., Defendants.**

**AT & T Communications of New England, Inc., Plaintiff,**

v.

**The Commissioners of the Connecticut Department of Public Utility Control, Defendants.**

**Civil Action Nos. 3:97CV1596AWT, 3:97CV1601AWT.**

United States District Court, D. Connecticut.

Sept. 29, 1998.

Paul E. Knag, Joshua van Hulst, Cummings & Lockwood, Stamford, CT, Maureen F. Del Duca, Jenner & Block, Washington, DC, Alan D. Mandl, Ottenberg Dunkless, Mandl & Mandl, Boston, MA, for MCI Telecommunications Corp, MCImetro Access Transmission Svcs, Inc.

Joseph Guerra, Sidley & Austin, Washington, DC, Donald E. Frechette, Edwards & Angell, Hartford, CT, for AT&T Communications of New England, Inc..

Ralph G. Elliot, Glory Martyn Lena, Kevin S. Murphy, Tyler Cooper & Alcorn, Hartford, CT, Kathleen Ann Carrigan, Southern New England Telephone Co., Madelyn M. DeMatteo, New Haven, CT, for Southern New England Telephone Co., Southern New England Telecommunications Corp., SNET America, Inc.

Mark F. Kohler, Robert S. Golden, Jr., Attorney General's Office, Public Utility Control, New Britain, CT, for Donald W. Downes, John W. Betkoski, III, Jack R. Goldberg, Glenn Arthur, Dept. of Public Utility Control.

William L. Vallee, Jr., Connecticut Office of Consumer Counsel, New Britain, CT, for Office of Consumer Counsel.

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

THOMPSON, District Judge.

This matter is before the court on the plaintiffs' motions for summary judgment and the defendants' cross-motions for summary judgment. For the reasons set forth below, the plaintiffs' motions are being denied and the defendants' motions are being granted.

## I. *Introduction*

In these consolidated actions seeking declaratory and injunctive relief, the plaintiffs, each of whom is a telecommunications carrier, challenge a decision by the Commissioners of the Connecticut Department of Public Utility Control approving the restructuring of certain operations of the Southern New England Telecommunications Corporation. The plaintiffs argue that this decision violates provisions of the Telecommunications Act of 1996 which impose special obligations on incumbent local exchange carriers.

### A. *The Telecommunications Act of 1996*

The Telecommunications Act of 1996 (the "1996 Act"), which is codified in Title 47 of the United States Code, is a comprehensive rewriting of the Communications Act of 1934 that "fundamentally changes telecommunications regulation." First Report and Order, No. 96–325, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996,* CC Docket No. 96–98 (FCC Aug. 8, 1996), 11 FCC Rcd. 15499 (1996), 1996 WL 452885 ("Local Competition Order") at ¶ 1. The broad purpose of the 1996 Act was "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies". 1996 Act, Pub.L. No. 104–104, purpose statement, 110 Stat. 56, 56 (1996).

Subtitle A of Title I of the 1996 Act is aimed at opening competition in local telephone service markets, by seeking to remove "not only statutory and regulatory impediments to competition, but economic and operational impediments as well." Local Competition Order at ¶ 3. To help achieve this goal, 47 U.S.C. § 251 imposes certain duties on local exchange carriers ("LECs") and incum-

bent local exchange carriers ("ILECs").[1] The latter group is required to, *inter alia:*

(1) negotiate in good faith binding interconnection agreements to fulfill the duties imposed on them under §§ 251(b) and 251(c), 47 U.S.C. § 251(c)(1);

(2) provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection at any technically feasible point of the same type and quality it provides to itself or any other party, on just, reasonable, and nondiscriminatory terms and conditions, 47 U.S.C. § 251(c)(2);

(3) provide access to "network elements" on an unbundled basis, 47 U.S.C. § 251(c)(3); and

(4) "offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers", 47 U.S.C. § 251(c)(4).

With respect to the resale obligation noted above, 47 U.S.C. § 252(d)(3) specifies that, when arbitrating an interconnection agreement, "a State commission shall determine wholesale rates on the basis of retail rates" charged to subscribers minus "any marketing, billing, collection, and other costs that will be avoided by the local exchange carrier" (the "avoided cost" wholesale discount). 47 U.S.C. § 252(d)(3).

Section 252 outlines the procedures for negotiation, arbitration, and approval of interconnection agreements between ILECs and requesting telecommunications carriers. 47 U.S.C. § 252. Primary responsibility for approval and oversight of such agreements is vested in State commissions. *See* 47 U.S.C. § 252(e)(1). Any party aggrieved by a State commission's approval or rejection of an interconnection agreement "may bring an ac-

tion in an appropriate Federal district court to determine whether the agreement … meets the requirements of section 251 … [and section 252]." 47 U.S.C. § 252(e)(6).

### B. *Undisputed Facts*

The plaintiffs in the first of two consolidated cases before this court are MCI Telecommunications Corporation and MCImetro Access Transmission Services, Inc. (collectively "MCI"). The plaintiff in the second case is AT & T Communications of New England, Inc. ("AT & T"). The plaintiffs are corporations providing long-distance and other telephone services throughout Connecticut and other parts of the United States. Statement of Material Facts Not In Dispute [docs. # 17, 22, 25 and 28].[2] MCI and AT & T hold a certificate of public convenience and necessity to offer local telephone service in Connecticut, and both intend to offer local telephone service in Connecticut in competition with defendant Southern New England Telephone Company ("SNET"). *Id.*

Defendant SNET is an ILEC under the 1996 Act and a telephone company that provides telephone services, including local exchange services, at wholesale and retail, in almost all areas of Connecticut. *Id.* Both defendant SNET and defendant SNET America, Inc. ("SAI") are wholly-owned subsidiaries of defendant Southern New England Telecommunications Corporation ("SNET Holding"). *Id.* The defendant Commissioners of the Connecticut Department of Public Utility Control (the "DPUC") are the members of the State commission responsible for approval and oversight of interconnection agreements between ILECs and new entrants to the Connecticut market under 47 U.S.C. § 252.

The DPUC has arbitrated separate interconnection agreements between MCI and

---

1. ILECs are defined in subsection (h) of this section as follows: "with respect to an area, the local exchange carrier that—(A) on February 8, 1996, provided telephone exchange service in such area; and (B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. § 69.601(b)); or (ii) is a person or entity that, on or after February 8, 1996, became a successor or

assign of a member described in clause (i)." 47 U.S.C. § 251(h)(1).

Thus, under this provision, a "successor or assign" of an ILEC may be subject to the obligations outlined in § 251(c).

2. All statements in the plaintiffs' Statements of Material Facts Not In Dispute are agreed to by the defendants. *See* Docs. # 25 and 28.

SNET and between AT & T and SNET. SNET Defendants' Memorandum of Law Re All Motions for Summary Judgment [doc. # 29] ("SNET Opposition Memo") at 7; Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment [doc. # 16] ("MCI Memo") at 8 n.5. These agreements require SNET, in accordance with § 252(d)(3), to offer its services for resale at a discounts off retail rates. Affidavit of Anne U. MacClintock [doc. # 30] at Exh. A, pp. 12–19; *id.* at Exh. B, pp. 40–46.

At the same time that these interconnection agreements were being negotiated and arbitrated, defendants SNET Holding and SNET filed a proposal with the DPUC for approval of a restructuring of certain operations. The principal component of the proposal was the separation of SNET Holding's retail and wholesale business units, the withdrawal of SNET from the retail telecommunications market, and the transfer of all retail operations and customers of SNET to defendant SAI. State Defendants' Memorandum of Law in Support of Their Cross–Motion for Summary Judgment and in Opposition to Plaintiffs' Motions for Summary Judgment [doc. # 26] (the "DPUC Opposition Memo") at 5.

By a decision dated June 25, 1997, the DPUC approved the restructuring proposal, subject to certain conditions and modifications. *See* Decision, *DPUC Investigation of the Southern New England Telephone Company Affiliate Matters Associated with the Implementation of Public Act 94–83,* Docket No. 94–10–05 (June 25, 1997) ("DPUC Decision"). For example, the DPUC refused to permit the direct transfer of SNET's retail customers to SAI, but, rather, imposed a "balloting process" whereby customers would be permitted to select a retail provider from among all those carriers (including MCI and AT & T) certified to provide local telephone service in Connecticut. DPUC Decision at 54–56. At the completion of the balloting process, SNET will cease its retail operations, and the assets relating to its retail business will be transferred to SAI. DPUC Opposition Memo at 7.

In addition, the DPUC limited the type and scope of customer service information that could be provided by SNET to SAI to information relating to those customers that become SAI retail customers and only to the extent that (i) such information is critical to the ongoing management of the retail subscriber function and (ii) corresponding information for non-SAI retail customers is provided to the respective retail provider chosen by those customers on the same terms and conditions as it is provided to SAI. *Id.* at 53–54.

In approving SNET's restructuring proposal, as modified, the DPUC specifically found that:

(1) the restructuring did not violate the 1996 Act, as an ILEC such as SNET is not subject to the resale obligations of §§ 251(c)(4) and 252(d)(3) if it does not offer any services on a retail basis, DPUC Decision at 50–51; and

(2) SAI was not a "successor or assign" of SNET under § 251(h) so as to subject it to the resale obligations of §§ 251 and 252, *id.* at 47–49.

The plaintiffs commenced this suit because of their objections to SNET's planned restructuring as approved by the DPUC, and, in particular, to the above findings of the DPUC.

## II. *Issues Presented*

Plaintiffs MCI and AT & T argue that the DPUC's decision of June 25, 1997, conflicts with the 1996 Act and violates the plaintiffs' claimed federal right to obtain services for resale from SNET at an avoided cost wholesale discount. In particular, the plaintiffs argue:

● that the 1996 Act does not permit an ILEC to withdraw from providing retail services altogether by transferring those services to an affiliate;

● in the alternative, that SAI must be considered a "successor or assign" of the retail operations of SNET, and, therefore, subject to the wholesale duties of an ILEC under the 1996 Act; and

● in any event, the DPUC's decision improperly fails to look through corporate form to prevent an evasion of congressional purpose.

Under the plaintiffs' view of the 1996 Act, SNET (acting in conjunction with its affiliates) cannot evade its statutory obligation under 47 U.S.C. §§ 251(c)(4) and 252(d)(3) to offer for resale its retail services at an avoided cost wholesale discount by shifting its retail functions to an affiliate.

As set forth in their Complaints, the plaintiffs bring this action pursuant to the Constitution and laws of the United States, including, in particular, the 1996 Act and 42 U.S.C. § 1983. They ask this court to issue a declaratory judgment that the Commissioners' decision approving the SNET restructuring violates the 1996 Act, or, alternatively, to issue a declaratory judgment that SAI is the successor to SNET's obligations as an ILEC and must offer services for resale at an avoided cost wholesale discount. The plaintiffs further seek to enjoin the Commissioners from approving any proposal that allows SNET or its affiliates to escape the obligation to offer services for resale at an avoided cost wholesale discount.

Defendants DPUC Commissioners and SNET, in opposition to the plaintiffs' motions for summary judgment (and in their own cross-motions for summary judgment), respond on both jurisdictional and substantive grounds. First, as a threshold matter, they argue

- that the plaintiffs do not present the court with a justiciable case or controversy ripe for decision under Article III of the United States Constitution, and

- that the plaintiffs fail to state a cause of action because (i) relief under 42 U.S.C. § 1983 is unavailable to them and (ii) the plaintiffs do not state a claim of federal preemption under the Supremacy Clause that would allow them to invoke the court's general federal question jurisdiction.[3]

Second, in response to the merits of the plaintiffs' claims, the defendants assert that the DPUC's decision approving the SNET restructuring is fully consistent with the 1996 Act. In particular, the defendants argue:

- that 47 U.S.C. §§ 251(c)(4) and 252(d)(3) do not require an ILEC such as SNET to remain in the retail business;

- that SAI should not be subject to the resale duties of an ILEC under the 1996 Act; and

- that there is no occasion to pierce the corporate veil in this case.

### III. Legal Standard

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir. 1994). Although a court cannot try issues of fact on a motion for summary judgment, *see, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975), questions of statutory interpretation and legislative history present legal questions properly resolved by summary judgment, *State of Oklahoma v. Weinberger,* 741 F.2d 290, 291 (10th Cir.1983), *cert. denied sub nom. Farrah v. United States,* 466 U.S. 971, 104 S.Ct. 2343, 80 L.Ed.2d 817 (1984). Here, the parties agree that the questions to be decided by the court are purely questions of law. *See, e.g.,* MCI Memo at 10–11; DPUC Opposition Memo at 2. The defendants' actions are not in dispute. Rather,

---

**3.** In addition, the defendants argue that there is no implied statutory cause of action under the 1996 Act itself. However, the plaintiffs do not contend otherwise. *See* AT & T Communications of New England's Reply Brief in Support of Its Motion for Summary Judgment and Brief in Opposition to Defendants' Cross–Motion for Summary Judgment [doc. # 32] ("AT & T Reply Memo") at 2. Rather, the plaintiffs claim that the court has jurisdiction to hear their claims on the following grounds: (i) a cause of action under 42 U.S.C. § 1983; and (ii) a suit for relief from the decision of a state regulatory agency that is preempted by federal statute. *See* Consolidated Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to the State Defendants' Cross–Motion for Summary Judgment [doc. # 34] ("MCI Reply Memo") at 2.

the present case concerns whether the 1996 Act permits such actions.

## IV. *Discussion*

### A. *Threshold Issues*

Before reaching the merits of the dispute as to the proper construction of the 1996 Act, the court must consider the jurisdictional issues raised by the defendants in their cross-motions for summary judgment.

#### 1. *Justiciability*

■ As an initial matter the court concludes that the plaintiffs present a judicially cognizable case or controversy that is ripe for decision under Article III, § 2, of the United States Constitution. The plaintiffs seek declaratory and injunctive relief from actions of the defendants which they assert are in violation of the 1996 Act. The Supreme Court has long held that federal courts have jurisdiction to issue declaratory judgments "[w]here there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged". *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *see also Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972).

■ Where the parties to a dispute present a "mere hypothetical question", *Longway v. Jefferson County Board of Supervisors,* 24 F.3d 397, 400 (2d Cir.1994), or an "abstract disagreement", *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds by Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), courts will not find the case ripe for resolution. However, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief". *Blanchette v. Connecticut General Insurance Corporation,* 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (internal quotation marks omitted). If the injury is "certainly impending", *id.,* then a justiciable controversy will be found.

Here, it is clear that: (i) SNET and SAI expect to be freed from the avoided cost wholesale methodology provided for in § 252(d)(3) after the corporate restructuring goes into effect;[4] and (ii) the DPUC will approve, after the restructuring, a pricing scheme for SNET's wholesale rates that is not consistent with § 252(d)(3).[5]

It may be, as SNET suggests, that there will be no renegotiation of the wholesale rates contained in the SNET/AT & T and SNET/MCI interconnection agreements during the three-year term of those agreements and, therefore, that current SNET retail rates will serve as the surrogate base for SNET's wholesale prices for the plaintiffs during the term of these agreements. Nevertheless, whether it happens sooner or later, it cannot be doubted that the renegotiation of SNET's wholesale rates based on a methodology inconsistent with § 252(d)(3) of the 1996 Act is "certainly impending". Moreover, it is undisputed that, before the expiration of the interconnection agreements, SNET's assets relating to its retail business will be transferred to SAI (a LEC in competition with the plaintiffs), and that whatever retail rates SAI charges will not be used as the basis for establishing the plaintiffs' wholesale rates.[6]

---

4. *See* DPUC Decision at 62 ("In the proposed method of calculating [its] wholesale prices," SNET proposes "to utilize its current retail rate as a surrogate base for determining the initial wholesale offering rate ... SNET notes that these methods will be used only for purposes of establishing initial wholesale rates for [its] services and that any subsequent rate changes will reflect the TSLRIC cost of providing the respective wholesale service.").

5. *See* DPUC Decision at 65 ("[The DPUC has] expressed its support for pricing methodologies constructed upon TSLRIC. TSLRIC-based pric-

ing methodologies promote both economic efficiency and competitive development. In contrast, *avoided cost methodologies such as those detailed in § 252(d)(3) of the 1996 Federal Act* do not promote economic efficiency and *will not be applicable to [SNET] after the current reorganization is in effect.*") (emphasis added).

6. *See* DPUC Decision at 47–49 (SAI is not a "successor or assign" of SNET under § 251(h) so as to subject it to the resale obligations of §§ 251 and 252); *id.* at 65 ("retail prices set by SAI are of only nominal interest to the [DPUC]").

The plaintiffs claim that each of these impending certainties violates their rights under the 47 U.S.C. §§ 251 and 252. Accordingly, the court finds that the parties present not a "mere hypothetical question", *Longway*, 24 F.3d at 400, but "a concrete case admitting of an immediate and definitive determination" of their legal rights, *Aetna Life Ins. Co. of Hartford, Conn.*, 300 U.S. at 241, 57 S.Ct. 461. This action for declaratory and injunctive relief is therefore justiciable under Article III, § 2, of the United States Constitution.[7]

### 2. *Bases for Plaintiffs' Claims*

■ As a second threshold matter, the court concludes, contrary to the defendants' position, that the plaintiffs have stated a cause of action under 42 U.S.C. § 1983 and thus the court has jurisdiction over this case pursuant to 28 U.S.C. § 1343.

Section 1983 imposes liability on anyone who, under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Section 1983 is an appropriate vehicle for obtaining both declaratory and injunctive relief. *See, e.g., Person v. Association of the Bar of the City of New York*, 554 F.2d 534, 537 (2d Cir.1977). The Supreme Court recently outlined the requirements for making a finding that the § 1983 remedy is available for a claimed violation of a federal statute. In *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 1359–60, 137 L.Ed.2d 569 (1997), it ruled that a court may grant relief under § 1983 if: (1) the statute at issue creates a federal right to the requested relief; and (2) Congress has not foreclosed private enforcement of the statute, either expressly in the statute itself, or impliedly, "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." As for the first condition, three principal factors

determine whether a statutory provision gives rise to a federal right: (i) the provision must be intended to benefit the plaintiff; (ii) the asserted right must not be so vague and amorphous that its enforcement would strain judicial competence; and (iii) the provision must "unambiguously impose a binding obligation on the States. As to the third factor, in other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms." *Id.* 117 S.Ct. at 1359.

With regard to the requirements outlined in *Blessing*, the court finds that the 1996 Act confers upon telecommunications carriers a federal right to obtain services for resale from ILECs at an avoided cost wholesale discount. First, the plaintiffs are undoubtedly among the intended beneficiaries of the statutory provisions at issue. As the FCC has explained, the 1996 Act "arms new entrants ... with powerful tools to dismantle the ... barriers that frustrated competitive entry in the past. *Sections 251 and 252 ... secure to new competitors the right to ... resale of incumbent LEC retail services purchased at wholesale rates.*" Memorandum Opinion and Order, No. 97–346, *In the Matter of Public Utility Commission of Texas* (FCC Oct. 1, 1997), 1997 WL 603179, at ¶ 2 (emphasis added); *see also TCG Detroit v. City of Dearborn*, 977 F.Supp. 836, 839 (E.D.Mich.1997) ("Plaintiff is a telecommunications carrier. The statute is entitled 'removal of barriers to entry' and its purpose, as well as the general legislative scheme of the 1996 Act, is to stimulate competition among telecommunications carriers. Accordingly, plaintiff is one of the class for whose benefit the [A]ct was passed.").[8] Second, the court does not find the asserted right to be so vague and amorphous that its enforcement would strain judicial competence. Third, the provisions at issue are couched in mandatory

---

7. The court further notes that it is often more appropriate to find a matter ripe for adjudication where the issue tendered is a purely legal one. *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. 1507; *cf. Socialist Labor Party v. Gilligan*, 406 U.S. 583, 587, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972) (finding record "skimpy in the sort of proved or admitted facts that would enable" adjudication of the claim).

8. The fact that the 1996 Act ultimately benefits the public does not negate the fact that the plaintiffs are among the intended beneficiaries. Indeed, as the plaintiffs note, Congress intends to benefit the public through *all* statutes.

rather than precatory terms. *See* 47 U.S.C. § 251(c)(4) (imposing upon ILECs the "duty" to offer for retail services for resale at wholesale rates); 47 U.S.C. § 252(d)(3) (State commissions "shall" determine wholesale rates on the basis of avoided cost methodologies).

The court further finds that Congress has not foreclosed private enforcement of §§ 251 and 252, either expressly in the 1996 Act itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with private enforcement under § 1983. It is undisputed that Congress did not explicitly foreclose private enforcement of these sections or of the 1996 Act as a whole. Indeed, Congress explicitly stated in the 1996 Act when it was foreclosing private rights of action. *See* 47 U.S.C. § 255(f). As for implicit foreclosure of the § 1983 remedy, the Supreme Court has "[o]nly twice . . . found a remedial scheme sufficiently comprehensive to supplant § 1983." *Blessing,* 117 S.Ct. at 1362; *see also German v. Federal Home Loan Mort. Corp.,* 885 F.Supp. 537, 576 (S.D.N.Y.1995) ("the 'sufficiently comprehensive' test has rarely been met", and defendants "have a heavy burden"). In the limited cases where preclusion of a § 1983 claim is found, the Court has found " 'unusually elaborate' enforcement provisions", *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 13, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), or detailed administrative and judicial procedures, which would be "render[ed] superfluous" by a § 1983 claim, *Smith v. Robinson,* 468 U.S. 992, 1009, 1011, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984).

In the court's view, the provisions of the 1996 Act detailing specific judicial or administrative remedies are not sufficiently comprehensive to supplant § 1983. *See Sprint Spectrum L.P. v. Town of Easton,* 982 F.Supp. 47, 52 (D.Mass.1997) ("[The 1996 Act] does not provide a comprehensive enforcement scheme intended to supplant a § 1983 remedy."). Those provisions cited by the defendants as evidence of a comprehen-

sive enforcement scheme are narrowly tailored to circumstances that are materially different from those in the present case. For example, § 252(e)(6) provides that any party aggrieved by a State commission's approval or rejection of a wholesale rate in an interconnection agreement "may bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of section 251 . . . [and section 252]." 47 U.S.C. § 252(e)(6). However, the violation the plaintiffs challenge here is *not* approval of a rate in an interconnection agreement, but the DPUC's decision to allow SNET to transfer its retail operations to an affiliate that will not assume SNET's resale obligations. In addition, under § 253(d), any person may petition the FCC for an order preempting enforcement of any state or local "statute, regulation or legal requirement" that "prohibit[s] or ha[s] the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a) and (d). While the plaintiffs might arguably challenge the DPUC's decision as "prohibiting their ability to provide telecommunications service"—something as to which the court takes no position—"nothing in the plain language of § 253(d) purports to confer exclusive jurisdiction with the FCC over the types of claims raised here . . . " *AT & T Communications of the Southwest, Inc., v. City of Austin, Texas,* 975 F.Supp. 928, 938 (W.D.Tex.1997).

Accordingly, the court concludes that the plaintiffs have asserted a judicially-cognizable cause of action under 42 U.S.C. § 1983, providing the court with jurisdiction to hear this case. In light of this conclusion, the court finds it unnecessary to reach the question of whether the plaintiffs may, in addition, invoke the Supremacy Clause to seek declaratory and injunctive relief from the DPUC's decision on the ground that it is preempted by the 1996 Act.[9]

### B. *The Merits*

Having found that the plaintiffs state a proper cause of action under 42 U.S.C.

---

**9.** At least one district court has considered this issue and has held that a plaintiff may *not* challenge a state public utility commission's compli-

ance with the substantive provisions of the 1996 Act by means of a preemption cause of action. *Utility Reform Network v. California Public Utili-*

§ 1983, the court now turns to the merits of the plaintiffs' argument that the DPUC's decision of June 25, 1997, violates their right under the 1996 Act to obtain services for resale from SNET at an avoided cost wholesale discount.

### 1. *ILEC Resale Duty Under § 251(c)(4)*

■ In approving SNET's proposal to discontinue its retail operations, the DPUC examined the 1996 Act and found that an ILEC is under "no legal obligation" to make generally available any telecommunications service as a retail service offering, but that

> once a decision is made by the ILEC to offer a particular service or capability on a retail basis, the ILEC then assumes an attendant obligation under the terms of § 251(c)(4)(A) of the 1996 Federal Act to make available an equivalent wholesale offering to qualified telecommunications carriers at a wholesale price set in accordance with terms contained in § 252(d)(3) of the 1996 Federal Act.

DPUC Decision at 50.

Section 251(c)(4) provides as follows: "[E]ach incumbent local exchange carrier has the following duties: ... The duty ... to offer for resale at wholesale rates any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A).

In the DPUC's opinion, § 251(c)(4) "affirms" that retail telecommunications services, which are subject to the resale requirements and pricing strictures set forth in the 1996 Act, "represent only a subset" of all services that might be offered by an ILEC, and, thus, any commitment to provide (or *not* to provide) a telecommunications service at retail is "a discretionary decision by the ILEC." *Id.*

Plaintiffs MCI and AT & T argue, to the contrary, that the 1996 Act does *not* allow an ILEC such as SNET to withdraw from the retail market. They assert that § 251(c)(4),

on its face, imposes upon ILECs a nondiscretionary duty to provide telecommunications services at retail so that these services may be resold at wholesale using an avoided cost discount. In essence, they claim an absolute right, as competitive local exchange carriers certified in Connecticut, to purchase SNET's services at wholesale using the pricing methodology provided for in § 252(d)(3).

The court does not find this argument persuasive. Although the plaintiffs emphasize that there is a nondiscretionary "duty" imposed by the 1996 Act's resale provision, they beg the question: "Duty" to do what? The plain language of § 251(c)(4) imposes a resale duty with respect to "*any* telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4) (emphasis added). The clear implication of this language is that if an ILEC provides no such services at retail, then there is no requirement that the ILEC offer telecommunications services for resale at wholesale rates. By way of contrast, nowhere does § 251 or any other provision of the 1996 Act require an ILEC to remain in the retail business or to resell its services at wholesale rates if it does *not* provide at retail telecommunications service to subscribers who are not telecommunications carriers. The court should not read such a requirement into § 251(c)(4) absent statutory language to this effect.[10]

This conclusion is supported by a reading of the resale provision in conjunction with the other provisions of § 251(c) that impose duties on ILECs (*i.e.*, duties as to interconnection and unbundled access). Unlike these other duties, an ILEC's resale duties are conditioned on the services being offered at retail. These various provisions must be read together, and the significance of restricting the resale duty to those services offered at retail to subscribers who are not telecommunications carriers must be given effect in interpreting the statute. *See, e.g.,*

*ties Commission,* 26 F.Supp.2d 1208, 1212–13 (N.D.Cal.1997).

**10.** As the Supreme Court instructed in *Robinson v. Shell Oil Company,* 519 U.S. 337, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997), the "first step in interpreting a statute is to determine whether the language at issue has a plain and unambigu-

ous meaning with regard to the particular dispute in the case. [The] inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent'" (quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

*Smith v. United States,* 508 U.S. 223, 233, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993).

The plaintiffs attempt to bolster their reading of the 1996 Act by pointing to § 251(f), which provides a mechanism under which a State commission may grant an ILEC suspension or modification of the application of one or more of the obligations imposed by §§ 251(b) and (c).[11] The plaintiffs assert that Congress would not have gone to the trouble of explicitly defining an exemption process and setting strict requirements for such exemptions had it not intended § 251(f) to be the only escape route available to ILECs. However, § 251(f) does not alter the meaning of § 251(c)(4): an ILEC has no need to be exempted, under § 251(f), from the resale obligation if that obligation does not apply to the ILEC.[12]

The plaintiffs also point to the 1996 Act's legislative history and FCC interpretations in support of their position. Yet where the language adopted by Congress is unambiguous, as it is here, a court "need not resort to extrinsic sources to further illuminate its meaning." *Burgo v. General Dynamics Corp.,* 122 F.3d 140, 143 (2d Cir.1997), *reh'g denied,* 128 F.3d 801; *see also Greene v. United States,* 79 F.3d 1348, 1353 (" '[w]hen we find the terms of a statute unambiguous, judicial inquiry is complete, except in "rare and exceptional circumstances." ' "). (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)), *cert. denied,* —— U.S. ——, 117 S.Ct. 582, 136 L.Ed.2d 512 (1996). Moreover, the extrinsic sources relied upon by the plaintiffs in their memoranda are inconclusive at best.[13]

In sum, the 1996 Act gives qualified competitive local exchange carriers such as the plaintiffs the right to obtain services for resale from ILECs at an avoided cost wholesale rate only under the conditions provided for by Congress in § 251(c)(4). Under the clear terms of that provision, this right exists only with respect to "any telecommunications service that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4). There is simply no implication from the statutory *text* that an ILEC, once in the business of offering retail service to subscribers who are not telecommunications carriers, is prohibited from withdrawing from that business. Nor is there any indication that it is prohibited from withdrawing by transferring its retail operations to an affiliate, subject of course to any restrictions imposed by other applicable federal or state statutes and regulations.

### 2. SAI's Status as a "Successor or Assign"

The plaintiffs next argue that—even if an ILEC can withdraw entirely from providing retail services—it does not follow, under the circumstances of this case, that the obligation to resell at an avoided cost wholesale rate simply vanishes. Rather, the plaintiffs assert, § 251(h)(1) of the 1996 Act provides that an ILEC's obligations attach to the ILEC's "successor or assign", and that SAI is clearly a successor to that aspect of SNET's business (*i.e.,* its retail functions) that is presently subject to the resale obligation.

The plaintiffs' claim that SAI should be considered a "successor or assign" of SNET has merit. However, the plaintiffs simply misread the statute when they insist that being a "successor or assign" of an ILEC, standing alone, is enough to subject a

---

11. § 251(f) allows a State commission to grant a suspension or modification if it determines that such suspension or modification is necessary to, *inter alia,* "avoid a significant adverse economic impact on users of telecommunications services generally" and "is consistent with the public interest, convenience, and necessity." 47 U.S.C. § 251(f)(2).

12. The court notes that the purpose of § 251(f) is not called into question by this conclusion, as § 251(f) applies to exemptions from *any* of the requirements contained in §§ 251(b) or (c).

13. For example, the plaintiffs cite a recent FCC order which states that "[s]ervices for resale must be provided by incumbent LECs at wholesale rates." Memorandum Opinion and Order, No. 97–346, *In the Matter Public Utility Commission of Texas* (FCC Oct. 1, 1997), 1997 WL 603179, at ¶ 2. Yet this statement merely purports to summarize the provisions of § 251(c), without analysis; it does not purport to clarify precisely what services "must" be provided by ILECs at wholesale rates beyond "any ... that the carrier provides at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4)(A).

telecommunications carrier to resale obligations under §§ 251 and 252. Section 251(h)(1) reads as follows:

> For purposes of this section, the term "incumbent local exchange carrier" means, with respect to an area, the local exchange carrier that—
>
> (A) on February 8, 1996, provided telephone exchange service in such area; *and*
>
> (B)(i) on February 8, 1996, was deemed to be a member of the exchange carrier association pursuant to section 69.601(b) of the Commission's regulations (47 C.F.R. § 69.601(b)); or (ii) is a person or entity that, on or after February 8, 1996, became a successor or assign of a member described in clause (i).

47 U.S.C. § 251(h)(1) (emphasis added).

Thus, as the FCC explained in a recent ruling, the 1996 Act defines a LEC as an ILEC with respect to a given service area if *both* of two separate conditions are met: *first*, the LEC must have provided telephone exchange service in that area on February 8, 1996, the date of enactment of the 1996 Act, 47 U.S.C. § 251(h)(1)(A); and, *second*, the LEC must have either been deemed to be a member of the National Exchange Carrier Association ("NECA") pursuant to § 69.601(b) of the FCC's rules as of that date of enactment, or become a successor or assign of a NECA member after that date, 47 U.S.C. § 251(h)(1)(B). Declaratory Ruling and Notice of Proposed Rulemaking, No. 97–171, *In the Matter of Guam Public Utilities Commission*, CC Docket No. 97–134 (FCC May 19, 1997), 12 FCC Rcd. 6925 (1997), 1997 WL 268703, at ¶ 14. Only if a telecommunications carrier satisfies both of these conditions can it be an ILEC subject to the "additional obligations" under § 251(c), including the resale obligation of § 251(c)(4).

Here, it is undisputed that SAI did *not* provide telephone exchange service in the State of Connecticut on February 8, 1996. Accordingly, because SAI fails to satisfy the condition set forth in § 251(h)(1)(A), SAI *cannot* be an ILEC pursuant to § 251(h)(1). This result holds even if SAI is a "successor or assign" of SNET and satisfies the condition set forth in § 251(h)(1)(B).

It must be conceded that § 251(h)(1), considered in isolation, appears to be an unusual formulation for a statutory provision purporting to address successors or assigns. In fact, it gives the appearance of allowing for a large loophole. However, it is important to note that § 251(h)(2) establishes an alternative ground for classifying a LEC such as SAI as an ILEC. Under this subsection, the FCC "may, by rule, provide for the treatment of a local exchange carrier (or class or category thereof) as an incumbent local exchange carrier for purposes of this section if—(A) such carrier occupies a position in the market for telephone exchange service within an area that is comparable to the position occupied by a carrier described in [§ 251(h)(1)]; (B) such carrier has substantially replaced an incumbent local exchange carrier described in [§ 251(h)(1)]; and (C) such treatment is consistent with the public interest, convenience, and necessity and the purposes of this section." 47 U.S.C. § 251(h)(2).

The court, of course, takes no position on whether it would be appropriate to treat SAI as an ILEC under § 251(h)(2), since the issue is one that the 1996 Act explicitly places within the jurisdiction of the FCC. *See id.* But the court does conclude that when clause (1) is read in conjunction with clause (2) of § 251(h), it is clear that Congress chose to address certain situations explicitly in the 1996 Act and chose to allow other situations to be addressed by the FCC pursuant to its rulemaking authority. Thus, even assuming that SAI is the "successor or assign" of SNET within the meaning of § 251(h)(1), that fact is not a sufficient basis to impose upon SAI, pursuant to § 251(c)(4), a duty to offer the plaintiffs telecommunications services for resale at an avoided cost wholesale discount.

### 3. *Piercing the Corporate Veil*

Finally, in support of their contention that the DPUC unlawfully violated their rights under the 1996 Act, the plaintiffs invoke the rule that the corporate form may be disregarded where it is interposed to defeat legislative purposes. *See, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 630, 103 S.Ct.

2591, 77 L.Ed.2d 46 (1983). In the plaintiffs' view, SNET's restructuring proposal, as approved by the DPUC, is specifically and expressly designed to allow it to avoid the obligation imposed by § 251(c)(4) to make its services available for resale at an avoided cost wholesale discount and thus to frustrate this statutory purpose.

There is a clear indication that at least one objective of the SNET restructuring is to enable SNET and its affiliates to escape the avoided cost wholesale discount requirement of §§ 251(c)(4) and 252(d)(3). As the DPUC pointed out in its decision, SNET Holding found that "the most notable market disadvantage presented to" it by the 1996 Act "is the requirement that it provide, at wholesale, essentially all of its retail telecommunications services ... at [an avoided cost wholesale] discount, regardless of whether that discount brings the wholesale price below cost ... " DPUC Decision at 12. Moreover, the DPUC itself makes no secret of its aversion to the avoided cost methodology and expresses its willingness to see the burden of § 252(d)(3) removed from SNET. *See id.* at 65 ("avoided cost methodologies such as those detailed in § 252(d)(3) of the 1996 Federal Act do not promote economic efficiency and will not be applicable to [SNET] after the current reorganization is in effect").

■ Nevertheless, even if the defendants *intended* that SNET evade its resale obligations, the court cannot conclude that their actions frustrate the legislative purpose of the 1996 Act and thus mandate disregarding the corporate form in this case. "While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person." *Schenley Distillers Corp. v. United States,* 326 U.S. 432, 437, 66 S.Ct. 247, 90 L.Ed. 181 (1946).

In drafting the Telecommunications Act of 1996, Congress' broad purpose was to promote competition and reduce regulation in the telecommunications industry. *See* 1996 Act, Pub.L. No. 104–104, purpose statement, 100 Stat. 56, 56 (1996). Yet Congress chose very specific statutory provisions to realize this broad goal and those provisions, for the reasons discussed above, reveal that it was *not* Congress' purpose to impose pursuant to statute the obligations of §§ 251(c)(4) and 252(d)(3) on either SNET or SAI following the corporate restructuring approved by the DPUC. In § 251(c), Congress carefully defined a resale duty limited to services that a carrier who is an ILEC provides "at retail to subscribers who are not telecommunications carriers." 47 U.S.C. § 251(c)(4). In § 251(h), Congress expressly defined incumbent local exchange carriers so as to exclude those telecommunications carriers that did not provide telephone exchange service in a given area on the date of enactment of the 1996 Act, but provided for comparable carriers to be treated, pursuant to the FCC's rulemaking process, as an ILEC. 47 U.S.C. §§ 251(h)(1) and (2). The court must give effect to the legislative purpose as expressed in the plain language of these provisions. To do otherwise in this case is to engage "not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court ..." *Iselin v. United States,* 270 U.S. 245, 251, 46 S.Ct. 248, 70 L.Ed. 566 (1926).

## V.  *Conclusion*

For the foregoing reasons, the plaintiffs' motions for summary judgment [docs. # 15 and 21] are hereby DENIED and the defendants' cross-motions for summary judgment [docs. # 24 and 27] are hereby GRANTED. Accordingly, the clerk shall enter summary judgment of dismissal in favor of the defendants.

It is so ordered.