**OMNIPOINT COMMUNICATIONS, INC., Plaintiff,**

v.

**PENN FOREST TOWNSHIP, Defendant.**

No. 3:CV–97–1584.

United States District Court, M.D. Pennsylvania.

March 31, 1999.

James A. Swetz, Stroudsburg, PA, for plaintiff.

Anthony Piazza, Kathleen E. Holmes, Lancaster, PA, for defendant.

## MEMORANDUM

VANASKIE, District Judge.

Plaintiff Omnipoint Communications, Inc. (Omnipoint) filed this action under 42 U.S.C. § 1983 and the Telecommunication Act of 1996, 47 U.S.C. § 332(c)(7), contending that the defendant Penn Forest Township (Penn Forest) improperly denied Omnipoint's request to place a 150 foot monopole on a 1.49 acre lot in a C–1 zoned area. (Dkt. Entry 1.) In its complaint, Omnipoint sought mandamus relief in addition to monetary damages. On February 13, 1998, Penn Forest moved to dismiss the complaint, contending, *inter alia*, that Omnipoint had failed to alleged sufficient facts to support a claim for mandamus relief and that a § 1983 claim for monetary damages cannot be based upon a violation of the Telecommunications Act. (Dkt. Entry 12.) On March 16, 1998, Omnipoint moved for summary judgment and for the issuance of peremptory judgment of mandamus. (Dkt. Entry 16.)

Because the denial of Omnipoint's request to erect its 150 foot monopole was not supported by substantial evidence, Omnipoint's motion for summary judgment will be granted and a peremptory judgment of mandamus will be entered against Penn Forest. Because Congress has provided a comprehensive mechanism for judicial review for alleged violations of the Telecommunications Act, thereby implicitly foreclosing a § 1983 action, Penn Forest's motion to dismiss the § 1983 claim will be granted.

## I. BACKGROUND [1]

In enacting the Telecommunications Ac of 1996, Congress extended federal court jurisdiction to local zoning decisions affecting the placement of communications antennae needed to create a seamless system for the transmission of wireless communications. To understand why Con-

---

1. Local Rule 56.1 requires that a party filing a motion for summary judgment also file a separate statement of material facts containing numbered paragraphs and citations to the record. Omnipoint has complied with this requirement. Local Rule 56.1 also requires a party opposing a motion for summary judgment to deny or admit each numbered paragraph of the moving party's statement of material facts. In this case, Penn Forest has failed to comply with this mandate. Instead, Penn Forest contends that Omnipoint's motion for summary judgment is premature as Penn Forest's motion to dismiss was never ruled upon by the Court. Penn Forest notes that it has not even answered Omnipoint's complaint. Accordingly, Penn Forest contends that it "is without knowledge or information sufficient to form a belief as to the truth of [Omnipoint's] averments at this time." (Def's Answer to Pl's SMF (Dkt. Entry 22) at 1.) This response, however, fails to recognize that Omnipoint has submitted the following written record: (1) the April 3, 1997 decision of the Penn Forest Township Zoning Hearing Board denying Omnipoint's request for a variance; (2) the January 2, 1997 decision of the Penn Forest Township Zoning Hearing Board granting a variance to Pennsylvania Cellular Telephone; (3) Omnipoint's zoning application dated May 28, 1997; (4) the September 16, 1997 decision of the Penn Forest Zoning Hearing Board denying Omnipoint's request for reversal of the zoning officer's refusal to issue a building permit; (5) the transcript of the April 3, 1997 public hearing before the Penn Forest Zoning Hearing Board; (6) the transcript of the August 8, 1997 before the Penn Forest Zoning Hearing Board; and (7) the Penn Forest Zoning Ordinance. (Pl's Exs. (Dkt. Entry 18).) Clearly, the record has been adequately developed insofar as review of Penn Forest's decision to deny Omnipoint's request to erect a tower on the lot in question is concerned. Penn Forest has failed to demonstrate that any discovery is necessary to resolve the issues raised by Omnipoint under the Telecommunications Act. Therefore, Penn Forest's objection to consideration of Omnipoint's summary judgment motion is without merit.

gress made the federal courts the fora for adjudication of zoning disputes, a brief narration of the manner in which personal wireless communications systems operate is instructive:

> [Personal Communication Services] and wide area [specialized mobile radio services] operate by transmitting low power radio signals between mobile, wireless units and fixed antennae mounted on towers, buildings, or other structures. Signals generated by mobile transmitters are fed to electronic cabinets at the base of the antennae, where they are connected to telephone lines, over which the transmission is routed to ordinary telephone equipment located anywhere in the world. A single antenna and its related equipment cabinet are called a "cell site."
>
> The distance over which the low-power signals emitted by mobile transmitters may be effectively broadcast to fixed, cell site antennae is limited to a relatively small geographic area, called a "cell." Accordingly, an overlapping, interconnected quilt of cells must be stitched together to provide seamless coverage. Where there is a "gap" in the pattern, the user's call is "dropped" or "disconnected."

*Sprint Spectrum L.P. v. Jefferson County,* 968 F.Supp. 1457, 1460 (N.D.Ala.1997).

On January 28, 1997, Omnipoint made an application to build a 150 foot monopole tower on a 1.49 acre lot in the Penn Forest Streams Development in connection with Omnipoint's efforts to develop a personal wireless telecommunications system in Northeastern Pennsylvania. (Def's SMF (Dkt. Entry 17) ¶ 8.) The proposed property was zoned as a C–1 district. On February 7, 1997, Roseann Cochrane, a Penn Forest Zoning Officer, denied the application on the ground that a communications tower was not a permitted use in a C–1 zone and instructed Omnipoint that a use and height variance was required. (Pl's SMF (Dkt. Entry 17) ¶ 10.) Omnipoint then filed a request for a variance with the Penn Forest Hearing Board. (*Id.* ¶ 11.)

On April 3, 1997, a public hearing was conducted. Omnipoint participated in the hearing without legal counsel. The Hearing Board denied the request for a use variance. (Pl's Exs. (Dkt. Entry 18) Ex. A.) Observing that § 5.300 of the Ordinance required a minimum lot size of 2 acres in a C–1 district, (*id.* ¶ 4), the Hearing Board concluded that Omnipoint needed a use variance before it would be permitted to build its monopole.[2] After setting forth the heavy burden necessary for a variance, the Hearing Board simply stated that Omnipoint had failed to meet its burden in that "the physical characteristics of the property could be used for a permitted purpose in a C–1 zoned district." (*Id.* ¶ 6.)[3]

Omnipoint did not appeal this decision. Instead, on May 28, 1997, Omnipoint made a second zoning permit application. (Pl's Exs. (Dkt. Entry 18) Ex. C.) Omnipoint, now represented by counsel, contended that the Board had erred in applying the 2–acre size requirement because the proposed 1.49 acre lot was a nonconforming lot, *i.e.,* it had been subdivided prior to the imposition of the two acre minimum. Omnipoint argued that the 2–acre restriction

---

**2.** The Ordinance provides that "agricultural and open space uses" are permitted uses in a C–1 district. (Pl's Exs. (Dkt. Entry 18) § 4.300.) "Agricultural and Open Spaces Uses" are:

> limited to the production of agricultural, nursery and forest products, golf courses and swimming pools, low intensity park and recreation areas, landscaped areas, *and radio transmission or receiving towers or facilities,* and the raising and keeping of

horses, livestock, and mules, provided the density does not exceed two horses, mules, or other livestock per acre of land.

(*Id.* Use Class 5.)

**3.** In February of 1997, the Penn Forest Township Zoning Hearing Board had granted a variance to Pennsylvania Cellular Communications Corp. to erect a 280–foot cellular communications tower on a lot in a C–1 district.

was not applicable to the nonconforming lot.[4] In addition to the argument that its proposed monopole was a permitted use in a C–1 district, Omnipoint also argued that, as a nonconforming lot, no height requirement could be imposed. (*Id.*)[5] Omnipoint's application was again denied. (Def's SMF (Dkt. Entry 17) ¶ 16.)

Omnipoint appealed this determination to the Zoning Hearing Board, repeating its arguments that (1) its proposed monopole was a permitted use in a C–1 district; (2) no height restriction could be imposed; and (3) no acreage restriction could be applied to a nonconforming lot. On August 8, 1997, a hearing was held before the Zoning Hearing Board. (Def's Exs. (Dkt. Entry 18) Ex. F.) On September 16, 1997, the Zoning Hearing Board denied Omnipoint's appeal and application, finding:

> The location of the proposed tower immediately adjacent to a major highway through the Township and surrounded by a residential development, Penn Forest Streams, leaves questions as to the safety of users of the highway and residents in the Development of Penn Forest Streams. The severity of the winters in the Pocono area are notorious, both in the quantity of snow and the intensity of winds and ice.

> Section 4.300 of the Penn Forest Township Zoning Ordinance provides:

**4.** A 1991 Amendment to the Ordinance provides:

> 7.100 *PERMITTED DEVIATIONS FROM REQUIRED AREAS*
> The minimum lot, yard and height requirements shall prevail in all cases, except as follows: .
> 7.101 *Existing Nonconforming Lots.* Any lot the area or dimensions of which were lawful prior to the adoption of this Ordinance, but which fails to conform to the requirements of the zoning district in which it is located by reason of such adoption.

(Pl's Exs. (Dkt. Entry 18) Ex. G.) That section goes further to provide certain minimum requirements to be applied to nonconforming lots. This amendment superseded the previous provision regarding nonconforming lots,

*USE CLASSES IN ZONING DISTRICTS*

> Fourteen "Use Classes" are hereby established as shown in Schedule I. The specific uses included in each Use Class are outlined below and none of these uses shall be permitted in any district if they are to be operated in such a manner as to create any dangerous, injurious, noxious, or otherwise objectionable fire, explosive, radioactivity, or other hazard; noise or vibration, smoke, dust, dirt, or other forms of air pollution, electrical glare or other disturbance, as identified in Article V, which will adversely affect the surrounding area or premises.

> Even if the erection of the tower is *under the strict intent of the Ordinance permissible*, it creates a danger and a hazard and would adversely affect the surrounding area.

> . The adjoining property owners, residents of Penn Forest Streams, objected to the location of the tower and stated their reasons and concerns.

> The Telecommunications Act is not being violated by this decision. *The decision is primarily based on safety of towers and their danger to the surrounding areas.* The contention that the Township Zoning Hearing Board discriminated against it, because the Zoning Hearing Board permitted a similar tower to be erected in a C–1 district in the Township is unfounded. The Act

which applied only to nonconforming lots located in R–1, R–2, R–3 and I–1 districts. (*Id.*)

**5.** As to nonconforming lots, section 7.102 provides:

> 7.102 *Height Limitations.* District height limitations shall not apply to church spires, cupolas and domes, monuments, water towers, chimneys smokestacks, silos, flag poles, utility poles and towers, *radio and television towers*, masts and aerials, and parapet walls extending not more than four (4) feet above the limiting height of the building.

(Pl's Exs. (Dkt. Entry 18) Ex. G.) Omnipoint contends that its monopole falls within the category of "radio and television towers."

prohibits unreasonable discrimination, and was intended to encourage free competition by preventing a municipality from favoring certain providers. This is not the case. The very location of the Cellular One tower is in a rural sparsely populated area is the sole reason for the granting of Cellular One's application.

(Def's Exs. (Dkt. Entry 18) Ex. D, at 4–5 (emphasis added).)

The Board did not dispute Omnipoint's contention that its proposed monopole was a permitted use in a C–1 district and that a nonconforming lot was not subject to the acreage and height limitations. Instead, it rested its determination upon safety concerns. Omnipoint challenges this determination as not being supported by substantial evidence; as unreasonably discriminating against it in view of the Board's decision to allow Pennsylvania Cellular Telephone Corp. to erect a tower in a C–1 district; and as having the effect of denying personal wireless services.

## II. DISCUSSION

### A. Omnipoint's Motion for Summary Judgment on the Telecommunications Act Claim

Essentially, the Telecommunications Act of 1996 authorizes a federal court to hear appeals from zoning board decisions. The record for review of the zoning ruling is compiled by the zoning board. It is therefore appropriate to adjudicate such an appeal on a summary judgment motion, with the administrative record providing the undisputed factual basis for the federal court's decision. This is particularly the case where, as here, there is a contention that the zoning board's decision is not supported by substantial evidence. Such a question generally must be decided on the basis of the information presented to the zoning board. In this case, Penn Forest has not contested the accuracy of the information presented in support of Omnipoint's motion. Accordingly, adjudication of all Telecommunications Act issues on

Omnipoint's summary judgment motion is proper.

The Telecommunications Act of 1996 was designed to promote competition in the personal telecommunications industry by limiting the ability of local authorities to regulate and/or control the expansion of telecommunications technology. *See Gearon & Co. v. Fulton County,* 5 F.Supp.2d 1351, 1353 (N.D.Ga.1998); *Cellco Partnership v. Town Plan & Zoning Comm'n,* 3 F.Supp.2d 178, 181 (D.Conn.1998) ("Congress passed the Telecommunications Act in an effort to increase competition in the telecommunications industry by placing limits on local zoning boards' regulation of the placement, construction, and modification of personal wireless service facilities."); *Smart SMR of N.Y., Inc. v. Zoning Comm'n of the Town of Stratford,* 995 F.Supp. 52, 56 (D.Conn.1998) ("Congress passed the Act in order to increase competition in the telecommunications industry."); *Sprint Spectrum L.P. v. Town of Farmington,* No. 97–863, 1997 WL 631104, at *2 (D.Conn. Oct. 6, 1997) (finding that Congress intended to limit local authority in favor of new telecommunication technology); *Sprint Spectrum L.P. v. Jefferson County,* 968 F.Supp. 1457, 1461 (N.D.Ala. 1997) (noting that the Act was intended to open market and promote competition). Although the Telecommunications Act placed certain restrictions upon local regulatory bodies, it did not completely preempt their ability to control zoning decisions in relation to telecommunications services. *See Town of Farmington,* 1997 WL 631104, at *2. Instead, Congress sought to balance the interests in promoting wireless technology with the rights of the local zoning authorities to maintain the integrity of land use rules. *See* 47 U.S.C. § 332(c)(7)(A) ("Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities."); H.R. Conf. Rep. No. 104–458, 104th Cong., 2d Sess.

207–08 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 222 ("The conference agreement creates a new section 704 which prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the conference agreement."). This balancing of interests was accomplished by imposing a few procedural requirements and two substantive limitations on local zoning authorities. To assure that the federally-imposed requirements and limitations were followed, Congress authorized federal court review of local zoning decisions impacting the provision of wireless communication services. 47 U.S.C. § 332(c)(7)(B)(v).

There are essentially two procedural safeguards contained in the Telecommunications Act. First, it requires that any adverse decision against a personal wireless services provider be in writing. 47 U.S.C. § 332(c)(7)(B)(iii); *Gearon & Co.*, 5 F.Supp.2d at 1354; *AT & T Wireless Servs. of Fla. v. Orange County*, 982 F.Supp. 856, 859 (M.D.Fla.1997); *see also PrimeCo Personal Communications, L.P. v. Village of Fox Lake*, 26 F.Supp.2d 1052, 1062 (N.D.Ill.1998) (finding that written decision need not be extensive and must only inform an applicant of the decision). Second, the decision must be supported by "substantial evidence." 47 U.S.C. § 332(c)(7)(B)(iii).

There are also two substantive provisions within the Telecommunications Act which protect personal wireless services providers and limit the authority of local zoning authorities. First, State or local government agencies "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Second, State or local government agencies "shall not unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I).

▮▮▮▮ In this case, Omnipoint contends that Penn Forest violated both the procedural safeguards as well as the substantive provisions of the Telecommunications Act. First, Omnipoint contends that the decision denying Omnipoint's request for a variance lacked substantial evidence. Second, Omnipoint argues that Penn Forest's refusal to grant a variance effectively prohibited the provision of personal wireless services. Finally, Omnipoint asserts that Penn Forest's denial of the variance constituted unreasonable discrimination between providers of functionally equivalent services. Because I find that Penn Forest's decision was not supported by substantial evidence, Omnipoint's arguments concerning alleged violations of the substantive safeguards need not be addressed.[6]

6. In any event, Omnipoint's substantive arguments are without merit. First, Penn Forest has not prohibited personal wireless services. *See Omnipoint Communications, Inc. v. City of Scranton*, 36 F.Supp.2d 222, 231 (M.D.Pa. 1999) ("[A] single decision by a local regulatory agency is insufficient to demonstrate a prohibition on personal wireless communication services. The courts have uniformly held that § 322(c)(7)(B)(i)(II) is violated only where the local regulatory agency creates a general ban against all personal wireless communication services."). Second, Omnipoint has failed to demonstrate that Penn Forest has unreasonably discriminated between functionally equivalent providers. In part, Omnipoint's argument rests upon the faulty premise that it should be provided the same treatment as a public utility. As I explained in rejecting this contention in the *City of*

*Scranton* case, the legislative history of the Telecommunications Act clearly indicates that the anti-discrimination provision "was intended to apply only to personal wireless services providers." *Id.* As in the *City of Scranton* case, "Omnipoint's reliance upon the right of conventional telephone providers (public utilities) to place its poles and wires in any district is not relevant to this inquiry under the Telecommunications Act." *Id.* Omnipoint also argues that Penn Forest "allowed a cellular-analog competitor to erect a tower in a C–1 zone." (Pl's Supp.Br. (Dkt. Entry 20) at 12.) Although Omnipoint's application also involved a property in a C–1 district, the record demonstrates that Omnipoint's request was denied based upon the unique location of its proposed tower site. It cannot be said that Penn Forest acted unreasonably in distin-

■ The substantial evidence standard is the traditional standard of review applied to agency determinations:

> [S]ubstantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Under this definition, a court may not displace an agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Likewise, in the context of the [Telecommunications Act of 1996], the court must affirm a board's decision "even if the court would decide the matter differently."

*Cellular Tele. Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus*, 24 F.Supp.2d 359, 365–66 (D.N.J.1998) (citations omitted); *see also PrimeCo Personal Communications*, 26 F.Supp.2d at 1063 ("'Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Geske & Sons, Inc. v. NLRB*, 103 F.3d 1366, 1374–75 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 46, 139 L.Ed.2d 13 (1997)). The local zoning authority bears the burden of demonstrating that substantial evidence existed to support its denial. *Cellco Partnership*, 3 F.Supp.2d at 182.

■■ To enable meaningful judicial review, a written decision cannot simply rely upon conclusory statements, but must provide some evidentiary basis to support each statement. *See Virginia Metronet, Inc. v. Board of Supervisors of James City County*, 984 F.Supp. 966, 973 (E.D.Va. 1998). Moreover, the "generalized concerns" voiced by opponents will not provide substantial evidence for an adverse decision against a personal wireless services provider. *See PrimeCo Personal Communications*, 26 F.Supp.2d at 1063 ("Under this standard, unsupported constituent testimony opposing cellular tower locations generally will not satisfy the substantial evidence test."); *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township*, 20 F.Supp.2d 875, 880 (E.D.Pa. 1998) ("Generalized concerns and conclusive statements within the record about the aesthetic and visual impacts on the neighborhood do not amount to substantial evidence."); *Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732, 745 (C.D.Ill.1997) ("But under substantial evidence review, the mere existence of opposition is insufficient to support an agency decision against a request. Instead, the agency must rely upon more than a scintilla of evidence that a decision against the request is warranted under the agency's criteria."); *Western PCS II Corp. v. Extraterritorial Zoning Auth. of the City and County of Sante Fe*, 957 F.Supp. 1230, 1236 (D.N.M.1997) (finding that "generalized concerns" of five neighbors failed to constitute substantial evidence for denial of requested application); *BellSouth Mobility Inc. v. Gwinnett County*, 944 F.Supp. 923, 928 (N.D.Ga.1996) (holding that generalized concerns do not amount to substantial evidence). *But see AT & T Wireless PCS, Inc. v. City Council of Virginia Beach*, 155 F.3d 423, 430–31 (4th Cir.1998) (suggesting that public outrage standing alone can constitute substantial evidence to deny a zoning request).

■ At the hearing conducted on its initial request for a variance, Omnipoint presented testimony of Michael Oser, who had been employed to develop and set up

---

guishing between an application for a tower in a rural area as opposed to an application for a tower in a more residential area. As explained in *City of Scranton*, Congress did not "'intend that if a State or local government grants a permit in a commercial district, it must grant a permit for a competitor's 50-foot tower in a residential district.'" 36

F.Supp.2d at 231 (quoting H.R.Conf. Rep. No. 104–458, 104th Cong., 2d Sess. 208 (1996), 1996 U.S.C.C.A.N. 124, 221–22). The question remains, however, whether there was substantial evidence for Penn Forest's determination that the proposed monopole presented a safety risk adversely affecting the surrounding properties.

the digital communications grid. Mr. Oser testified that the monopole was designed to meet all applicable building codes. (Pl's Exs. (Dkt. Entry 18) Ex. E, Tr. 4/3/97 hearing, at 23–24.) Mr. Oser testified that the monopoles were designed to withstand winds of 80 mph with ½ inch of ice loading. (*Id.* at 10.) [7] He noted that after Hurricanes Andrew and Hugo, monopoles remained in place. (*Id.* at 11.) In terms of lightening concerns, Mr. Oser testified that the monopole was grounded, would not attract lightening, and that, even if struck by lightening, would withstand such a strike. (*Id.* at 36.) Finally, Mr. Oser testified that the monopole would be structurally sound. (*Id.*)

Several members of the adjacent residential development expressed concern over the safety of the tower. Clark Wooding stated:

> I'm more concerned when [the ice] start to melt and we have high gales like we've had recently, what's going to happen to this ice if it's not contained to that property. It's going to blow over into the development where there's building lots for homes where traffic comes down the road and where children play. Now what's going to be done to protect those properties and the automobiles and the children if this tower is erected?

(*Id.* at 50.) Another resident of the development, Grace Martin, expressed her fear that the monopole could topple from severe weather and injure individuals in the development. (*Id.* at 51–52.)

All of this testimony concerning the safety of the monopole occurred at the April 4, 1997 hearing. After the April hearing, the Zoning Hearing Board denied the request for a variance on the ground that Omnipoint had failed to meet its bur-den of demonstrating that the property had no other economic uses. (Pl's Exs. (Dkt. Entry 18) Ex. A.) Omnipoint reapplied for permission to erect the monopole, contending that an error had been committed in determining that the monopole was not a permitted use in a C–1 district. This application was denied and a second hearing was conducted. At the August 8, 1997 hearing, there was little discussion concerning the safety of the proposed monopole by Omnipoint or members of the Board. [8] Two residents of the adjacent development, however, rose to challenge the safety of the monopole. John Rodia testified that he was concerned that ice could gather on the monopole to the extent that it would collapse onto the highway. (Pl's Exs. (Dkt. Entry 18) Tr. 8/8/97 hearing, at 61.) Grace Martin again expressed her opposition:

> And I don't need to see this tower staring me in the face every morning, and God forbid with the bad weather we have here and it falls in the middle of the street or my kids have to worry about something falling on them. I don't need to worry about that. If he wants it, make him put it on his property where he lives or somewhere else.

(*Id.* at 63.) The Board denied Omnipoint's application precisely because it found that the monopole presented a safety risk to the surrounding community. (Pl's Exs. (Dkt. Entry 18) Ex. D.)

The Board's written decision did not cite to any competent evidence to support its determination that the proposed monopole created a danger to the community. Omnipoint presented evidence that the monopole would withstand winds of 80 mph while coated with ½ inch of ice. Omnipoint also represented that the monopole would be constructed according to applicable codes and regulations. The questions con-

---

**7.** One of the Zoning Board members indicated that the conditions that the monopole could withstand were "pretty severe." (*Id.* at 36.)

**8.** The bulk of Omnipoint's presentation at the August 8, 1997 hearing dealt with the provisions of the Telecommunications Act and the effect that a denial of its application would have on Omnipoint's ability to provide personal wireless services.

cerning the safety of the monopole could best be described as "generalized concerns" of residents of the adjacent development. These concerns were not substantiated. No evidence was presented of the likelihood of a monopole falling over. Such unsubstantiated "generalized concerns" do not constitute substantial evidence under the Telecommunications Act. As noted in *Iowa Wireless Services, L.P. v. City of Moline*, 29 F.Supp.2d 915 (C.D.Ill. 1998):

> [T]here is no evidence supporting the general concerns expressed by a few citizens that the proposed tower posed a threat to the public because it might collapse. While one citizen provided evidence that a tower had fallen when it was hit by a tornado, IW provides evidence that the tower was an old design and that an IW tower in the vicinity of the tornado did not collapse. Furthermore, IW provided evidence that the proposed tower would be constructed to FCC specifications and that it would be designed to collapse on itself, not topple as earlier designs could. *A layperson's testimony that a tower might fall is simply not probative evidence, given the evidence IW presented to the contrary.*

*Id.* at 921 (emphasis added).

Penn Forest bore the burden of demonstrating that substantial evidence existed for its determination that the monopole presented a safety risk. Penn Forest has failed to meet that burden. Therefore, Omnipoint's motion for summary judgment will be granted and a peremptory judgment of mandamus will be issued against Penn Forest.[9]

9. Penn Forest does not dispute the fact that the property in question was a nonconforming lot and, therefore, the 2–acre limitation could not be applied to it. Penn Forest also does not dispute the fact that the height restrictions were inapplicable.

10. Penn Forest also moved to dismiss Omnipoint's request for the issuance of a peremptory judgment of mandamus requiring Penn Forest to grant Omnipoint's request for a zon-

## B. Penn Forest's Motion to Dismiss the Civil Rights Claims

### 1. Standard

In deciding a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must draw all reasonable inferences from the facts pled in the complaint and construe them in the light most favorable to the claimant. *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1400 (3d Cir.1991); *Truhe v. Rupell*, 641 F.Supp. 57 (M.D.Pa. 1985). The court, however, need not accept as true "conclusory allegations of law, unsupported conclusions and unwarranted inferences." *Pennsylvania House, Inc. v. Barrett*, 760 F.Supp. 439, 449–50 (M.D.Pa. 1991). Thus, a Rule 12(b)(6) motion does not serve to question a plaintiff's well-pled facts, but rather tests the legal foundation of the plaintiff's claims. *United States v. Marisol, Inc.*, 725 F.Supp. 833, 836 (M.D.Pa.1989). The Rule 12(b)(6) movant carries the burden of showing the legal insufficiency of the claims asserted. *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980). A Rule 12(b)(6) motion will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Pennsylvania House*, 760 F.Supp. at 449–50.

### 2. Whether the Telecommunications Act Confers a Federal Right Enforceable under 42 U.S.C. § 1983[10]

■ Recently, the United States Supreme Court reiterated the factors to be considered in determining whether a fed-

ing permit. Penn Forest contends that Omnipoint cannot satisfy the elements necessary for injunctive relief. (Def's Supp.Br. (Dkt. Entry 21) at 4.) Courts, however, routinely grant the relief requested by Omnipoint where a violation of the Telecommunications Act is found. Therefore, Penn Forest's motion to dismiss Omnipoint's request for a peremptory judgment of mandamus will be denied.

eral statute confers a right enforceable under § 1983:

> In order to seek redress through § 1983, ... a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law.* We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms.

> Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress "specifically foreclosed a remedy under § 1983." Congress may do so expressly, forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.

*Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (citations omitted).

It is clear that the Telecommunications Act was intended to benefit wireless service providers such as Omnipoint. *See Omnipoint Communications Enters., L.P. v. Zoning Hearing Bd. of Chadds Ford Township,* No. 98–3299, 1998 WL 764762, at *5 (E.D.Pa. Oct.28, 1998) ("Because Omnipoint is the type of plaintiff that the Act intended to benefit, requirement one is satisfied."); *National Telecommunication Advisors, Inc. v. City of Chicopee,* 16 F.Supp.2d 117, 120 (D.Mass. 1998). Moreover, the Telecommunications Act specifically provides for review of local regulatory bodies "in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v). Given that federal courts were provided this jurisdiction, "[o]bviously, the assumption by Congress in enacting the statute was emphatically not that the plaintiff's interest is 'beyond the competence of the judiciary to enforce.'" *National Telecommunication Advisors, Inc.,* 16 F.Supp.2d at 120; *see also Chadds Ford Township,* 1998 WL 764762, at *5 ("By giving courts this power to review, Congress clearly believed that the interests protected by the TCA were not 'so vague and amorphous' that their enforcement would be beyond judicial competence."). As to the final factor, it is apparent that the Telecommunications Act places mandatory requirements upon local regulatory boards, *i.e.,* a written decision supported by substantial evidence, no blanket prohibition against personal wireless services, and no unreasonable discrimination against functionally equivalent providers. *See Chadds Ford Township,* 1998 WL 764762, at * 6 ("Finally, the plain language of the Act is couched in mandatory terms. It requires that the state and local authorities shall not prohibit the provision of wireless services and further requires the decisions of such authorities to be in writing and supported by substantial evidence. Hence, the third requirement is also satisfied."); *National Telecommunication Advisors, Inc.,* 16 F.Supp.2d at 120 (same).[11]

---

11. It should be noted, however, that Pennsylvania law already required local regulatory bodies to provide written decisions based upon substantial evidence. *See* 2 Pa.Cons. Stat.Ann. § 754(b) (providing the "substantial evidence" standard for an appeal of a local agency action); 53 P.S. § 10908(9) (requiring that denial of zoning application must be written and "each decision shall be accompanied by findings of fact and conclusions based thereon together with the reasons therefor"); *Lex v. Zoning Hearing Bd. of Hampton Town-*

Congress has not expressly foreclosed a § 1983 action based upon a violation of the Telecommunications Act. *See, e.g., Chadds Ford Township,* 1998 WL 764762, at *7 ("Nothing in the language of the Act itself expressly precludes an action under section 1983, therefore, the relevant question is whether Congress impliedly foreclosed such action."). Thus, the question arises as to whether the Telecommunications Act creates a "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353.

Most of the courts that have considered this question have determined the Telecommunications Act failed to provide for an enforcement scheme so comprehensive as to foreclose a § 1983 action. *See Chadds Ford Township,* 1998 WL 764762, at *7 ("[T]his Court does not find that the remedial scheme of the Telecommunications Act of 1996 is sufficiently comprehensive to imply that Congress intended to foreclose a remedy under section 1983."); *Smart SMR of N.Y., Inc. v. Zoning Comm'n of the Town of Stratford,* 995 F.Supp. 52, 61 (D.Conn.1998) ( "[T]he Act does not implicitly or explicitly foreclose section 1983 actions, nor [does] the Act provide a comprehensive enforcement scheme which would preclude a section 1983 claim."); *Sprint Spectrum L.P. v. Town of Easton,* 982 F.Supp. 47, 53 (D.Mass.1997) ("More particularly, the TCA does not provide a comprehensive enforcement scheme intended to supplant a § 1983 remedy."); *see also MCI Telecommunications Corp. v. Southern New England Tele. Co.,* 27 F.Supp.2d 326, 333–34 (D.Conn.1998) (finding that a violation of the Telecommunications Act could form

the basis of a § 1983 claim); *APT Minneapolis, Inc. v. City of Maplewood,* No. 97–2082, 1998 WL 634224, at *7 (D.Minn. Aug.12, 1998) (same); *Cellco Partnership v. Town Plan & Zoning Comm'n of the Town of Farmington,* 3 F.Supp.2d 178, 186 (D.Conn.1998) (same).

On only two occasions has the United States Supreme Court "found a remedial scheme sufficiently comprehensive to supplant § 1983." *Blessing,* 520 U.S. at 347, 117 S.Ct. 1353 (citing *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)). In *Smith v. Robinson,* the Court determined that the Education of the Handicapped Act established:

> an elaborate procedural mechanism to protect the rights of handicapped children. The procedures not only ensure that hearings conducted by the State are fair and adequate. They also effect Congress' intent that each child's individual educational needs be worked out through a process that begins on the local level and includes ongoing parental safeguards, and a right to judicial review.

*Id.* at 1010–11, 104 S.Ct. 3457. Given the comprehensive nature of the "procedures and guarantees" set forth in the Education of Handicapped Act, the Court determined that Congress did not intend for § 1983 to be used to enforce that act. *Id.* at 1012, 104 S.Ct. 3457 ("Allowing a plaintiff to circumvent the EHA administrative remedies would be inconsistent with Congress' carefully tailored scheme.").[12]

ship, —— Pa.Cmwlth. ——, ——, 725 A.2d 236, 237 (1999) (finding that a local zoning board abuses its discretion where there is not substantial evidence to support its decision). Thus, in part, the Telecommunications Act merely afforded personal wireless services providers a *federal* forum for review of an adverse zoning decision, as opposed to requiring those personal wireless services providers to seek such review through the state system.

12. "In response to *Smith,* Congress amended the EHA to add § 1415(f), a provision which establishes that the statute's provisions are not the sole means for redress available to disabled children and their parents." *W.B. v. Matula,* 67 F.3d 484, 493 (3d Cir.1995). In *Matula,* the Third Circuit determined that *Smith* had been overruled by congressional action. *Id.* at 494. ("We have previously characterized the enactment of § 1415(f) as

In *Sea Clammers*, the plaintiffs attempted to assert a § 1983 claim based upon a violation of the Federal Water Pollution Control Act. The Court found that the Act contained "unusually elaborate enforcement provisions, conferring authority to sue for this purpose both on government officials and private citizens." *Sea Clammers*, 453 U.S. at 13, 101 S.Ct. 2615. First, it provided that the Environmental Protection Agency could respond to violations of the Act by seeking compliance orders and civil suits. *Id.* Moreover, it provided that any "interested party" could seek judicial review in the courts of appeals for action taken by the Environmental Protection Agency. *Id.* at 13–14, 101 S.Ct. 2615. The Act also provided "citizen-suit provisions" which allowed a private citizen to sue for injunctive relief. *Id.* at 14, 101 S.Ct. 2615. Because of the elaborate enforcement provision, the Court determined that Congress did not intend to allow citizens to seek enforcement of the Act through a § 1983 action. *Id.* at 21, 101 S.Ct. 2615 ("We therefore conclude that the existence of these express remedies demonstrates not only that Congress intended to foreclose implied private actions but also that it intended to supplant any remedy that otherwise would be available under § 1983.").[13]

Thus, the existence of private judicial remedies is significant in making a determination as to the comprehensive nature of a remedial scheme. In *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the United States Supreme Court determined that tenants *could* maintain a § 1983 action for violations of the Housing Act. In pertinent part, the Court stated:

> overruling *Smith*. Far from inferring a congressional intent to *prevent* § 1983 actions predicated on [the Individuals with Disabilities Education Act] then, we conclude that Congress explicitly *approved* such actions." (citation omitted)).

**13.** In contrast, the United States Supreme Court recently determined in *Blessing* that

In both Sea Clammers and Smith v. Robinson, *the statutes at issue themselves provided for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy.* There is nothing of that kind found in the Brooke Amendment or elsewhere in the Housing Act. Indeed, the only private remedy provided for is the local grievance procedures which the Act now requires.

*Id.* at 427, 107 S.Ct. 766; *see also Farley v. Philadelphia Hous. Auth.*, 102 F.3d 697, 703 (3d Cir.1996) ("The Supreme Court has held that in enacting the U.S. Housing Act, Congress did not specifically foreclose a § 1983 remedy by enactment of a comprehensive scheme of remedial mechanisms.").

Thus, the application of *Smith* and *Sea Clammers* to this case turns upon whether Congress provided for private judicial remedies within the Telecommunications Act. Congress clearly did so. After considering *Smith, Sea Clammers* and *Blessing*, one court recently stated:

> Although the path is by no means free from brambles, these authorities do mark a passage to only one conclusion: a § 1983 action is not available to obtain a remedy for violation of the TCA for the following reasons
>
> First, the statute provides a clear, detailed process that allows quick and complete remedies for individuals improperly denied permission to erect a personal wireless communications tower. Given this carefully drafted provision, and the absence of any indicia of contrary legislative intent, it is manifest that Congress provided precisely the

Title IV–D of the Social Security Act was not so comprehensive as to preclude a § 1983 action. In particular, the court found it significant that, unlike the procedural safeguards in *Robinson* and *Sea Clammers*, a "private actor" could not bring an action to enforce the provisions of Title IV–D. *Blessing*, 520 U.S. at 348, 117 S.Ct. 1353.

remedies it considered appropriate when drafting the TCA. Given that litigation under the TCA will inevitably be directed, from time to time, at relatively unsophisticated, small or remote townships, the absence of any provision for fees in the TCA is telling.

Second, this case bears a strong resemblance to *Smith* and *Sea Clammers*. In both cases, the statute at issue expressly allowed judicial review of either the decision made at the hearing, or of the Administrator's actions. Here, a private cause of action and expedited judicial review is mandatory.

\* \* \* \* \* \*

[T]he comprehensiveness of the TCA's remedial scheme is perhaps best evidenced by the fact that the § 1983 statutory apparatus adds *nothing* to plaintiff's remedial armament under the TCA—except the opportunity to seek attorney's fees under § 1988. In other words, plaintiff has tacked Count III onto its complaint merely for fees. While the desire to recoup fees is understandable, the use of § 1983 in such a way trivializes this important statute and is inconsistent with its intent.

*National Telecommunication Advisors, Inc.*, 16 F.Supp.2d at 122 (citations omitted).

▆▆ I find this reasoning persuasive and likewise conclude that Congress has provided a comprehensive remedial mecha-

nism for enforcement of the Telecommunications Act. Therefore, Penn Forest's motion to dismiss the § 1983 claim based upon violations of the Telecommunications Act will be granted.[14]

In *Chadds Ford Township*, the court disagreed with the rationale advanced in *National Advisors* for two reasons. First, the court believed that *National Advisors'* reliance upon the expedited judicial review provision in the Telecommunications Act was misplaced because such logic would render any statutory scheme that provided for federal judicial review sufficiently comprehensive to foreclose a § 1983 action. *Chadds Ford Township*, 1998 WL 764762, at \*9 ("Taken to its limit, the district court's reading of *Blessing* ... suggests that any statutory remedial scheme that provides a mechanism for judicial relief would render the scheme sufficiently comprehensive to infer Congressional intent to foreclose reliance on § 1983."). Given *Smith, Sea Clammers, Wright* and *Blessing*, I must respectfully disagree. Judicial review was precisely the remedial factor emphasized in *Smith, Sea Clammers, Wright* and *Blessing*.

Moreover, it is difficult to envision a judicial mechanism more comprehensive than that established by Congress in the Telecommunications Act—direct and expedited federal judicial review without any need to exhaust state remedies.[15] Al-

---

**14.** Penn Forest also argued that it could not be liable under § 1983 because there was no "policy" or "practice" as required under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Penn Forest fails to recognize, however, that a single action by an official body may provide a basis for a § 1983 claim. *See, e.g., Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) ("[I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body— whether or not that body had taken similar

action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy."). Thus, Penn Forest's reliance upon *Monell* is misplaced.

**15.** Moreover, the Telecommunications Act also allows a personal wireless services provider to petition the FCC commissioner where a local regulatory agency bases its refusal of a request for construction of a personal wireless services facility upon the potential danger from radio frequency emissions. 47 U.S.C. § 332(c)(7)(B)(v). Thus, Congress concluded that expedited judicial review would be sufficient in most cases, but did provide for one exception involving radio frequency emissions.

though the Telecommunications Act may not provide "elaborate" procedural trappings, the simplicity of its remedial scheme does not preclude a determination that it is comprehensive. Congress provided the ultimate remedial measure: expedited federal judicial review.[16]

Second, the court in *Chadds Ford Township* contended that *Johnson v. Orr*, 780 F.2d 386 (3d Cir.1986), required recognition of a § 1983 claim here. *Chadds Ford Township*, 1998 WL 764762, at *10. After carefully reviewing *Orr*, I find that *Orr* actually supports the conclusion that the Telecommunications Act forecloses a § 1983 claim. In *Orr*, the Third Circuit found that the 1968 National Guard Technicians Act, which only provided internal administrative remedial procedures without an explicit judicial review mechanism, failed to rise to the level of the statutes at issue in *Sea Clammers* and *Smith*.[17] In this regard, the only manner in which a party could obtain *judicial* review of a claimed violation of the 1968 National Guard Technicians Act was to request review of the final administrative determination pursuant to the Administrative Procedure Act. In sharp contrast, the Telecommunications Act explicitly provides for expedited judicial review in federal court without exhaustion of state or administrative remedies. Thus, I find the court's reliance upon *Orr* in *Chadds Ford Township* to be misplaced.

In short, Congress has provided personal wireless service providers with a comprehensive *federal* judicial review mechanism. By providing such expedited judicial review, Congress implicitly foreclosed the use of § 1983 to enforce the Telecommunications Act. Therefore, Penn Forest's motion to dismiss the § 1983 claim based upon violations of the Telecommunications Act will be granted.

### 3. Other Claims under § 1983

■ Omnipoint has also alleged that Penn Forest's conduct was arbitrary and capricious and resulted in a denial of due process. Generally, "[s]ection 1983 is not a means for litigating in a federal forum whether a state or local administrative decision was arbitrary and capricious." *See Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 888 (2d Cir.1987); *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 832 n. 9 (1st Cir.), *cert. denied*, 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982); *Macombs Pharmacy, Inc. v. Wing*, No. 97–5550, 1998 WL 696008, at *2 (S.D.N.Y. Oct.6, 1998). To this extent, Omnipoint cannot maintain a procedural due process claim as the Third Circuit has determined that Pennsylvania's scheme for challenging zoning determinations satisfied procedural due process. *See Rogin v. Bensalem Township*, 616 F.2d 680, 695 (3d Cir.1980) ("In Pennsylvania the procedure for challenging zoning ordinances substantially conforms with the general due process guidelines enunciated by the Supreme Court."), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *see also Midnight Sessions, Ltd. v. City of Phila.*, 945 F.2d 667, 681 (3d Cir.1991) ("The availability of a full judicial mechanism to challenge the administrative decision to deny an application, even an application that

16. This point is particularly salient in a situation where Congress has essentially federalized the state proceedings relative to zoning determinations, *i.e.*, written decisions based upon substantial evidence. The Telecommunications Act makes clear that it was not intended to totally preempt state authority over zoning decisions. 47 U.S.C. § 332(c)(1)(7)(A). To assert that Congress intended to not only provide expedited judicial review of local zoning determinations, thereby supplanting state procedural safeguards, but also provide for a § 1983 action against local regulatory bodies for actions traditionally governed by state law stretches the Telecommunications Act too far.

17. Judge Rosenn dissented in *Orr*, explaining that he believed that the Act provided a comprehensive remedial scheme. *Orr*, 780 F.2d at 403 ("Congress did not intend section 1983 to supplant or even augment the remedies it had established for aggrieved technicians in the 1968 Act.").

was wrongly denied, precluded a determination that the decision was made pursuant to a constitutionally defective procedure."), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1668, 118 L.Ed.2d 389 (1992); *Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.) (finding that developer could not maintain a § 1983 action against municipal board for the denial of building permit because the state provided " 'reasonable remedies to rectify a legal error by a local administrative body.' ") (quoting *Cohen v. City of Phila.,* 736 F.2d 81, 86 (3d Cir.), *cert. denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984)), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 107 (1988).

▆ In terms of a substantive due process claim, Omnipoint has failed to allege that Penn Forest's decision was motivated by "bias, bad faith, improper motive, racial animus, or the existence of partisan political or personal reasons." *Midnight Sessions,* 945 F.2d at 683; *see also DeBlasio v. Zoning Bd. of Adjustment,* 53 F.3d 592, 601 (3d Cir.) (finding that denial of zoning permit for "political or personal reasons" could support substantive due process claim under § 1983), *cert. denied,* 516 U.S. 937, 116 S.Ct. 352, 133 L.Ed.2d 247 (1995); *Bello,* 840 F.2d at 1129–30 (finding a § 1983 claim for violation of substantive due process properly pled where it was alleged that building permit was denied for "political or personal reasons unrelated to the merits of the application"); *Neiderhiser v. Borough of Berwick,* 840 F.2d 213, 217–18 (3d Cir.) (finding § 1983 claim for arbitrary and capricious denial of zoning variance where sole basis for denial was adult content of proposed movie rentals), *cert. denied,* 488 U.S. 822, 109 S.Ct. 67, 102

L.Ed.2d 44 (1988). Instead, Omnipoint has merely alleged repeatedly that Penn Forest's written decision was not supported by substantial evidence. Omnipoint does not ascribe any evil motive to Penn Forest's action or that it was motivated by reasons unrelated to the merits of Omnipoint's application; instead, Omnipoint only claims that Penn Forest erred in its final determination. As such, Omnipoint has failed to allege facts sufficient to support a § 1983 substantive due process claim.[18]

▆ Finally, Omnipoint attempts to use an alleged violation of the "dormant" commerce clause to support its § 1983 claim.[19] Omnipoint contends that Penn Forest's action "unduly burden[ed] and impede[d] its ability to provide wireless services throughout the Eastern United States particularly within Northeastern Pennsylvania." (Pl's Pop. Br. (Dkt. Entry 15) at 15.) Omnipoint argues further that "[t]he Penn Forest Zoning Ordinance simply does not accommodate the needs of this new technology and has the effect of *prohibiting service* within certain areas since it does not recognize wireless services as essential, allows a greater prerogative to a state regulated utility than to a federal licensee, and has allowed a similar tower to Pennsylvania Cellular in a C–1 zone." (*Id.* at 15–16.) As noted earlier, Omnipoint has failed to demonstrate that Penn Forest prohibited the construction and placement of personal wireless facilities; rather, Omnipoint concedes that other personal wireless providers were permitted to erect and maintain such facilities in Penn Forest.[20] Thus, the Penn Forest

---

18. Moreover, the record demonstrates that Penn Forest reacted to the safety concerns expressed by its citizens. Reliance upon such concerns cannot support a substantive due process claim for arbitrary and capricious action. *Midnight Sessions,* 945 F.2d at 685 ("[T]he state may consider community sentiment in evaluating applications for licenses if community objection is based on legitimate state interests such as, inter alia, traffic, safety, crime, community pride, or noise.").

19. In *Dennis v. Higgins,* 498 U.S. 439, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991), the Court found that a § 1983 claim may be based upon a violation of the commerce clause.

20. Significantly, the record discloses that there was an existing utility tower within Penn Forest and Omnipoint's search ring, and Omnipoint was seeking to install its antennae on that utility tower. It is clear that Omnipoint was not prohibited from erecting its

Zoning Ordinance does not prohibit personal wireless services; it merely regulates where they may be located. The Telecommunications Act does not give personal wireless service providers *carte blanche* authority to select the lowest cost location for its towers, but instead reserves to local zoning bodies significant authority in applying local zoning rules to the placement issue. Moreover, Omnipoint's argument that Penn Forest may not treat conventional telephone companies differently is inconsistent with the legislative history of the Telecommunications Act. *See City of Scranton,* 36 F.Supp.2d at 233–34. Finally, Omnipoint's contention that Penn Forest unreasonably discriminated between it and Pennsylvania Cellular is without merit. A reasonable ground existed for the alleged discrimination, namely the potential danger that Omnipoint's monopole would pose to the surrounding residents. In short, Omnipoint's commerce clause arguments are without merit.[21]

### III. CONCLUSION

Because Penn Forest's decision to deny Omnipoint's application was not supported by substantial evidence, Omnipoint's motion for summary judgment on Count I will be granted and a peremptory judgment of mandamus will be entered against Penn Forest. Moreover, because Omnipoint has failed to allege facts that would support a § 1983 action, Penn Forest's motion to dismiss Count II will be granted.

antennae in Penn Forest on the existing utility tower. Its desire to erect its monopole on the lot in question was driven by its inability or unwillingness to negotiate an acceptable arrangement with the owner of the existing utility tower.

21. The problem with Penn Forest's determination is not that it was improper to consider the safety of its citizens in denying Omnipoint's application; rather, Penn Forest's safety determination was not based upon substantial evidence. Omnipoint has provided no authority to support the proposition that a local zoning authority may be held liable for a commerce clause violation under § 1983 because it denied a zoning application on legitimate grounds but failed to develop on the record substantial evidence to support its decision. Nor has independent research discovered such a case.

In short, Omnipoint has failed to demonstrate that Penn Forest has excluded out-of-state personal wireless service providers from constructing and maintaining personal wireless communications facilities in the Township. In fact, the record demonstrates that Penn Forest was concerned, not with the construction of Omnipoint's monopole, but rather with its placement. At most, Omnipoint has demonstrated a disagreement over the placement of Omnipoint's proposed tower, not a policy or regulation that "benefitted instate economic interests and burdened out-of-state economic interests." *Smart SMR,* 995 F.Supp. at 60. Therefore, Penn Forest's motion to dismiss the § 1983 claim based upon alleged commerce clause violations will be granted.